**Charlotte KLINGER and Eric Klinger, Plaintiffs,**

v.

**Edward C. ROSE, Revelle W. Brown, Wm. Fulton Kutz, Howard E. Simpson, Sidney D. Koine, E. Paul Gangewere, Jervis Langdon, Jr., Watson F. Tate, Jr., Edward F. McGinley, Jr., Frank C. LaGrange, the Baltimore and Ohio Railroad Company, and Reading Company, Defendants.**

No. 64 Civ. 3653.

United States District Court
S. D. New York.

Oct. 1, 1968.

Sidney B. Silverman, by Pomerantz, Levy, Haudek & Block, New York City, Robert Block, New York City, of counsel, for plaintiffs.

Alexander & Green, New York City, Eugene Z. DuBose, New York City, of counsel, for defendant Baltimore and O. R.R. Co.

Royall, Koegel, Rogers & Wells, New York City, Charles F. Young, New York City, and Ernest R. von Starck, Philadelphia, Pa., of counsel, for defendant Reading Co.

## OPINION

TYLER, District Judge.

Plaintiffs, the owners of both common and preferred stock of Reading Company ("Reading"), a common carrier, have brought this derivative action on behalf of Reading seeking treble damages from the Baltimore and Ohio Railroad Company ("B&O"), another common carrier, and from ten individual defendants who were directors of Reading at the time of the alleged misconduct. None of the individual defendants have been served. The suit is brought under Sections 4[1] and 10[2] of the Clayton Act. The defendants B&Q and Reading[3] jointly move for summary judgment dismissing the complaint pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure.

1. "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15.

2. 15 U.S.C. § 20. That Section provides in pertinent part:
"No common carrier engaged in commerce shall have any dealings in securities, supplies, or other articles of commerce, or shall make or have any contracts for construction or maintenance of any kind, to the amount of more than $50,000, in the aggregate, in any one year, with another corporation, firm, partnership, or association when the said common carrier shall have upon its board of directors or as its president, manager, or as its purchasing or selling officer, or agent in the particular transaction, any person who is at the same time a director, manager, or purchasing or selling officer of, or who has any substantial interest in, such other corporation, firm, partnership, or association, unless and except such purchases shall be made from, or such dealings shall be with, the bidder whose bid is the most favorable to such common carrier, to be ascertained by competitive bidding under regulations to be prescribed by rule or otherwise by the Interstate Commerce Commission."

3. There is some disagreement between the parties as to the reason that Reading, for which recovery is sought in this action, has joined in B&O's motion. Plaintiffs claim that this fact is more evidence that the two railroads are in collusion. Defendant Reading claims that it has opposed plaintiffs because if plaintiffs are successful in this suit it will indicate that Reading has committed a crime under Section 10.

Most of the facts have been stipulated by the parties. The transaction which is the basis of this action was the April, 1963 termination of Reading's interest in the Philadelphia Perishable Products Terminal Company ("Terminal"), a corporation created by the two railroads in 1927 to hold a joint terminal facility in Philadelphia. In 1927, Reading and B&O were each issued 250 shares of the common stock of Terminal, and in 1936 each was issued $2,000,000 of 4% negotiable demand notes by the company.

In the early 1960's Reading sought to terminate its interest in Terminal, and in April, 1963 sold its common stock and notes to B&O for $225,250 cash and $900,000 payable in 5 annual installments at 3% interest. On April 30, 1964, B&O paid the first installment with interest and pre-paid the balance of $720,000 discounted at 5% per year.

In connection with this transaction neither Reading nor B&O ever attempted to solicit bids pursuant to Section 10 and the rules of the Interstate Commerce Commission ("I.C.C.") promulgated thereunder.[4]

At the time of this transaction Reading and B&O had several directors in common. E. Paul Gangewere was president and director of Reading and a director of B&O, Jervis Langdon, Jr. was director of Reading and president of B&O (and part of its governing body), and Howard E. Simpson was a director of both railroads. Permission had been received by each of these individuals from the I.C.C. pursuant to Section 20a (12) of the Interstate Commerce Act, 49 U.S.C. § 20a(12), to hold the respective interlocking directorships. At that time B&O owned 42% of the outstanding common stock of Reading. Reading was represented in the negotiations leading to the sale by John F. Kerslake, who was then an employee of the Chesapeake & Ohio Railway Company, B&O's parent.

The complaint alleges that Reading received for its interest in Terminal consideration that was inadequate by $765,000, and that this loss was a result of the failure of the Reading board of directors to obtain public bids as required by Section 10. The complaint also asserts that this failure by the board of directors was a direct result of the domination of the board by B&O and the acquiescence of the individual defendants in the sale to B&O.

The primary basis for the joint motion for summary judgment by B&O and Reading is that Section 10 is not applicable to this transaction. The defendants make four arguments based on their interpretation of the legislative history of Section 10.

1. Defendants' first argument is based upon the word "securities" in the first paragraph of Section 10. Defendants correctly point out that nowhere is the word defined for purposes of the Clayton Act and that the meaning of the word in statutes varies.[5] Defendants then describe certain parts of the legislative history which indicate that Congress' primary reason for inserting the word "securities" in Section 10 was to cover the gross abuses of interlocks between investment bankers and the railroads.[6] Defendants take great pains to characterize this sale of stock and notes as a mere paper transaction—the termination of a joint venture. Their conclusion is that this sale, which could have been accomplished by dissolving Terminal and selling to B&O Reading's share of the assets, did not constitute "dealing in securities" within the meaning of Section 10.

The answer to this argument lies in the statute itself. Section 10 prescribes public bidding on certain " * * * deal-

4. 49 C.F.R. Part 1010.

5. See, e. g., Securities Act of 1933, § 2(1), 15 U.S.C. § 77b(1); Securities Exchange Act of 1934, § 3(a) (10), 15 U.S.C. § 78c(a) (10); Interstate Commerce Act, § 20a, 49 U.S.C. § 20a; Federal Power Act, § 3(16), 16 U.S.C. § 796(16); Internal Revenue Code, Sections 351, 354, 355, 1236(c).

6. Hearings, H.Judic.Comm., 63d Cong, 2d Sess., Trust Legislation, 1913–14, pp. 679–80, 1062.

ings in securities, supplies, *or other articles of commerce.*" (Emphasis added.) The notes and stock in question fall within any normal meaning of the word "securities". Moreover, they are "articles of commerce" in the sense that they were apparently transferrable to third parties. Presumably defendants would not contend that if these notes and shares of common stock had been sold by Reading to a third party with which Reading had an interlock, they would not be "securities" for purposes of Section 10. The transaction under consideration here was not different merely because the sale was made to the owner of the other half of Terminal.

Defendants' argument that if Reading had accomplished the sale by another method Section 10 surely would not have applied begs the question. I assume that the parties had good and sufficient reasons for accomplishing the result in the manner they chose, a transfer of stock and notes. I have no occasion to consider whether the defendants could have avoided the operation of Section 10 by using a different form.

▆ 2. Defendants' second argument, also based primarily upon an interpretation of legislative history, is that Section 10 does not apply to an interlock between two railroads. It is said that Section 10 applies only to so-called "vertical" interlocks, e. g., those in which a common carrier has directors in common with a supplier or an investment banker.[7]

The statute, of course, does not except "horizontal" interlocks. Furthermore, the authorities to which defendants have cited have concentrated on the nature of the interlock rather than the nature of the transaction. The draftsmen of Section 10 as it now reads decided in favor of prohibiting certain tainted transactions rather than prohibiting interlocks outright.[8] As the defense memoranda point out, the present wording of Section 10 indicates that the Congress was concerned with vertical transactions rather than horizontal anticompetitive relationships which are covered in other parts of the statute. But the transaction in issue can be viewed as a vertical transaction, the nature of which is not changed by the fact that the purchaser was a competing railroad. Reading, in financial difficulties, sought through this sale to divest itself of properties not necessary for its current railroad operations and to enhance its precarious cash position. The mere fact that the buyer of the securities was a railroad rather than an investment banker does not obviate the abuse which Congress sought to remedy. On the contrary, if there was in fact damage to the Reading as a result of this sale, *this is precisely the type of transaction which Section 10 was designed to cover.* This contention, then, is rejected.

▆ It is suggested by counsel that the result of so deciding this point makes it practically impossible for two railroads to engage in this type of transaction because each would be required to get competitive bids, the seller being forced to accept the highest bid and the buyer the lowest. Two suggestions can be made on this point. First, where one of the two carriers dominates the other to the extent of holding 42% of its common stock, as here, the purposes of Section 10 are fulfilled if the dominated carrier alone obtains public bids. Second, if it be assumed that this and no other solution is available to substantially comply with the competitive bidding provisions of Section 10, perhaps this is not the kind of transaction in which two carriers ought to participate.[9]

▆ 3. Defendants' third venture into legislative history gives rise to their

---

7. H.Rep. 627, 2 H. Reps. Misc. II; 63d Cong.2d Sess., p. 3; S.Rep. No. 698, 2 Sen. Reps. Misc. II, 63d Cong.2d Sess., 47–48. See, F.T.C. Report on Interlocking Directorates at 11 (1951); Staff of Sub Comm. No. 5, House Comm. on the Judiciary 89th Cong., 1st Sess., Interlocks in Corporate Management 10, 27 (Comm. Print 1965).

8. 51 Cong.Rec. 16002–3 (Oct. 1, 1914).

9. In re Missouri Pacific R. Co., 13 F.Supp. 888, 893 (D.Mo.1935).

conclusion that Section 10 applies only to securities issued by the common carrier itself. They rely on a footnote in Minneapolis & St. Louis R. Co. v. U. S.[10] That case was an appeal from an order of the I.C.C. The petitioner seeking to overthrow the Commission's order argued that there would be a violation of Section 10 if the Commission's order were enforced. In the course of dismissing this objection on a ground not important for our purpose, the Court made the following statement:

> "Section 10 of the Clayton Act is, of course, an antitrust law, and much of what we have just said relative to the problem of accommodation of § 5(2) of the Interstate Commerce Act and the antitrust laws is equally applicable to this contention. The evident purpose of § 10 of the Clayton Act was to prohibit a corporation from abusing a carrier by palming off upon it securities, supplies and other articles without competitive bidding and at excessive prices through overreaching by, or other misfeasance of, common directors, to the financial injury of the carrier and the consequent impairment of its ability to serve the public interest.[13]
>
> 13. The legislative history of § 10 of the Clayton Act, though meager, supports the view stated in the text. In fact, the language of the several drafts of § 10, together with the types of abuses cited in support of its enactment, suggests strongly that the words 'dealings in securities' were intended to cover only a carrier's dealings with related persons in its own securities. See H.R.Rep. No. 627, 63d Cong., 2d Sess., p. 3; S.Rep. No. 698, 63d Cong., 2d Sess., pp. 47–48; S.Doc. No. 585, 63d Cong., 2d Sess., pp. 8–9; 51 Cong. Rec. 15943."[11]

It is at once apparent that the second sentence of footnote 13 and the text which it supports are inconsistent. The fact is that the legislative history indicates some concern with both types of abuses, and the Section subsequently has been applied to both purchases and sales of securities.[12] Accordingly, I am not convinced that a limitation should be read into Section 10 that the word "securities" means only the carrier's own securities.

■ 4. Finally, defendants maintain that Section 10 cannot be enforced by a private suit under Section 4 of the Clayton Act.[13] They submit that because Section 10 contains its own criminal penalties and provides for rules by the I.C.C. regulating the public bid process, Congress did not intend that a private suit would be available in Section 10 cases. Defendants also point out that the I.C.C. has construed the statute to allow it to hear private complaints based on violations of Section 10 and that the Congress specifically exempted Section 10 cases from § 16 (15 U.S.C. § 26) which provides for private injunctive relief.

My conclusion is to the contrary. Section 4 provides a cause of action where a person has been injured by a violation of "the antitrust laws". In interpreting another statute, the Supreme Court has held that Section 10 is an "antitrust law".[14] The courts and the agencies charged with enforcing the antitrust laws have consistently recognized the value of private suits in securing compliance with the statutes. It is also clear that the remedies under these statutes were designed to be cumulative.[15] But, say defendants, because the Congress did not see fit to allow private injunctive relief in Section 10 cases, it follows that a private suit for damages is likewise prohibited. If any inference is to be drawn from the Congress' failure to except Section 10 cases from the operation of Section 4 while making such an ex-

---

10. 361 U.S. 173, 190, n. 13, 80 S.Ct. 229, 4 L.Ed.2d 223 (1959).

11. Id.

12. It is apparent that the I.C.C. in drafting its regulations has assumed this to be true. 49 C.F.R. §§ 1010.1(a), 1010.3.

13. The statute is set out at n. 1.

14. Minneapolis & St. Louis R. Co. v. U. S., supra, n. 9, at 190, 80 S.Ct. 229.

15. See, United States v. Borden Co., 347 U.S. 514, 518, 74 S.Ct. 703, 98 L.Ed. 903 (1953).

ception in Section 16, it is that the private suit for damages was to remain a remedy for this type of transaction. Thus, the fourth "defense" is rejected.

In summary, defendants' four legal arguments raised on this motion to the effect that this transaction is not the proper basis for a private suit under Section 10 must fail. It follows that defendants' motion for summary judgment based on these arguments must be and is denied.

■ There remains the question of whether or not plaintiffs' motion for partial summary judgment on all issues except that of damages should be granted. Rule 56(c) and (d), F.R.Civ.P. In the light of the views expressed heretofore in this opinion, it might be said that the stipulated facts are sufficient for granting plaintiffs' motion as prayed. Nevertheless, there are at least two complaint allegations which suggest that plaintiffs may wish to present additional proof, and, if they do, that defendants will wish to rebut such proof by evidence of their own. To illustrate, in paragraph "six" of the complaint, it is alleged, *inter alia,* that defendant B&O not only dominated and controlled the affairs and directors of Reading but that such defendant has used its power and control over Reading to benefit itself and to damage Reading in the manner thereafter set forth in the complaint. Further, in paragraph "eight", it is alleged that the facilities of Terminal have been used almost exclusively by B&O and its subsidiaries, but notwithstanding this fact, Reading has been caused to join with B&O in financing and maintaining Terminal. In the exercise of caution, I am constrained to deny plaintiffs' motion for partial summary judgment upon the possibility that they will wish to adduce additional proof in support of the aforementioned allegations at trial and because these allegations of "dominance" tend to be somewhat intertwined with the question of damages. Parenthetically, however, the alleged issue of whether or not Terminal is a "paper company" would seem to be irrelevant and thus not susceptible of further fact development at trial in the light of the legal views heretofore expressed in this memorandum. Rule 56(d), F.R.Civ.P.

It is so ordered.