**Charlotte KLINGER and Eric Klinger**

v.

**Edward C. ROSE, the Baltimore & Ohio Railroad Company, et al.**

**No. 64 Civ. 3653.**

United States District Court
S. D. New York.

July 17, 1969.

Sidney B. Silverman, and Pomerantz, Levy, Haudeck & Block, New York City, for plaintiffs.

Alexander & Green, New York City, for defendant Baltimore & Ohio Railroad Co.

## OPINION

TYLER, District Judge.

On October 1, 1968, this court denied a joint motion for summary judgment filed by defendants The Baltimore & Ohio Railroad Company ("B&O") and Reading Company ("Reading"). 291 F.Supp. 456 (S.D.N.Y.1968). Thereafter, on February 17, 18, 19 and 21, 1969, this action was tried before the court without a jury. On consideration of the evidence adduced at trial and the post-trial memoranda of law submitted by the parties, this opinion is filed to constitute the findings of fact and conclusions of law required by Rule 52, F.R. Civ.P.

This is a derivative action brought on behalf of Reading by plaintiffs, the own-

ers of four shares of Reading common stock and one share of Reading second preferred stock against B&O, Reading and others [1] upon the claim that there was a violation by defendants of Section 10 of the Clayton Act, 15 U.S.C. § 20, with resultant damage to Reading. Consequently, plaintiffs seek treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15.

## I.

### The Transaction

Although most of the salient facts are not in serious dispute, and notwithstanding that many of these essential facts have already been recited in the earlier opinion of this court, it nevertheless is useful to set forth here the facts as they unfolded at the trial. The key transaction giving rise to this litigation, of course, is the sale on April 30, 1963 to B&O by Reading of securities representing the latter's one-half interest in the Philadelphia Perishable Products Terminal Company ("Terminal"). At the time of this transaction, there were three common directors on the boards of B&O and Reading, and B&O owned 42% of the equity of Reading. The sale of the Reading one-half interest in Terminal was made without competitive bids as required by Section 10 of the statute.

Late in 1925, Reading and B&O had agreed in general terms to acquire land and assemble thereon a joint fruit and produce terminal in South Philadelphia, Pennsylvania. The land was to be assembled with each railroad contributing 50% of the cost thereof and 50% of the cost of construction of the terminal facilities. The two railroads eventually decided to form a new company to take title to the terminal property. Thus, the Terminal was formed and denominated a holding company; Reading and B&O were each issued 250 shares of the capital stock.

Written documents evidencing the agreements between the parties and Ter-

minal were executed finally on December 22, 1931. Under the terms of an operating agreement between B&O and Reading, each company made capital contributions in equal shares with the understanding that profits and depreciation costs were to be shared on a user basis. The three-party contract between the two railroads and Terminal provided, *inter alia*, that the two railroads would have the use of the terminal as a joint facility and would receive all income and revenues therefrom as if title to the property and Terminal were vested in them.

From December, 1931 until April 30, 1963, directors and officers of Terminal consistently and exclusively were officers, directors, employees and lawyers of B&O and Reading. In the initial period of operation of Terminal, both railroads made advances to Terminal, each in the total amount of $2,000,000. In 1936, notes were issued to evidence these advances, with Reading and B&O each receiving $2,000,000 in face amount of Terminal demand notes.

Sometime in the early summer of 1962, representatives of Reading and B&O began discussions about the possibility of B&O acquiring Reading's interest in Terminal. Although substantially irrelevant to the controversy, I accept B&O's position that these discussions were initiated by Reading.

Concededly, at the time of the initiation of these discussions in the summer of 1962, B&O owned approximately 42% of Reading's stock. Thus, as B&O's counsel admit, B&O had the power to control Reading and in fact exercised that power on occasions during the period relevant to this litigation. B&O, of course, did nothing affirmative to prevent Reading from seeking competitive bids. On the other hand, none of its representatives ever suggested to Reading that the latter seek such bids. No representative of either railroad discussed or even considered possible application of Section 10 of the Clayton Act to this sale

---

1. B&O is the actual defendant as this litigation has developed. The other defend-

ants, save for Reading as a technical defendant, have not been served.

of Reading's one-half interest in Terminal represented by its shares of capital stock and the demand notes evidencing its advances of $2,000,000. Neither Reading nor B&O ever made any attempt to determine whether a third party would be interested in purchasing Reading's interest. Apparently, none of the railroad officials involved thought this property could possibly be of any interest to anyone other than B&O.

There can be no doubt that in 1962 and in early 1963, the principal impetus for this transaction came from Reading, which then was in straitened financial condition. In December, 1962, the president of Reading had approached the president of B&O to see whether or not B&O could recommend someone to give Reading financial assistance and advice. At that time, the Chesapeake & Ohio Railway Company ("C&O") was in the process of obtaining stock control of B&O. Consequently, as a result of conversations between representatives of the three railroads, a Mr. Kerslake, who was then Assistant Vice President-Finance officer of C&O, was asked by B&O to work with Reading on a consulting basis. Thus, from December, 1962 until at least mid-1963, Kerslake worked at Reading in an effort to solve its financial problems. Among other things, he was the principal negotiator of the transaction in question in his capacity as de facto chief finance officer of Reading.

Prior to Kerslake coming into the picture, representatives of Reading had obtained an appraisal of the Terminal property from the Philadelphia real estate firm of Albert M. Greenfield & Co. A vice president of that company, Meltzer, was in charge of this particular appraisal of the land and improvements of Terminal. His written appraisal was prepared and dated November 1, 1962. He therein stated that the fair market value of the land and improvements of Terminal was the sum of $2,100,000. At trial, he testified that the allowable range of fair market value was somewhere between $1,500,000 and $2,100,000. According to the evidence, the officials of Reading were thoroughly satisfied with Meltzer's appraisal and accepted its conclusions without much question.

The property of Terminal consisted of about 34.6 acres. The southern portion of that property, containing about 611,000 square feet (approximately 14 acres), had been leased in 1953 to a wholly-owned subsidiary of B&O called Schuylkill River East Side Railroad Company ("Schuylkill"). This was a five-year lease which granted Schuylkill an option to purchase the leased subdivision at a price of $.57 per square foot. In 1958, this lease was renewed on the same terms and conditions to expire on June 30, 1963. In other words, up until June 30, 1963, B&O through Schuylkill had an option to purchase this property from Terminal at a price of $.57 per square foot.

Certain improvements, including most particularly concrete platforms, loading ramps, railroad tracks, controls and switches, were located on the terminal property. Also, there were buildings and improvements on the premises which Meltzer valued at $600,500. Meltzer, however, did not ascribe a specific value to the tracks, ballast, ties, concrete platforms, ramps or any controls or switches in the Greenfield appraisal.

In January, 1963, representatives of B&O and Reading inspected the Terminal property incident to entering into detailed negotiations. Negotiations continued with Kerslake acting for Reading and first Baukhages and then Brown representing B&O. Finally, the parties agreed that the fair value of Terminal property and assets consisted of the appraised value of the improvements (Meltzer appraisal), the appraised value of $1.00 per square foot for all of the property not under lease to Schuylkill, the option price of $.57 per square foot for the 611,000 square feet under that lease, the face value of a purchase money mortgage from Quaker City Cold Storage Company and an amount representing book value of the tracks less approximately $45,000 for wear and tear. These

figures came to a rounded total of $2,-250,000, of which one-half, of course, equals $1,125,000.

Interestingly, not only Reading but also B&O was in poor financial condition in late 1962 and early 1963.[2] These circumstances undoubtedly influenced the negotiations and the terms of sale which were finalized on April 30, 1963. The final terms included an agreement by Reading to accept from B&O a cash down payment of $225,250.[3] It was also agreed that the balance of $900,000 due to Reading was to be paid in five equal annual installments bearing interest at 3%. It appears that the 3% interest was conceived as a means of giving Reading approximately the equivalent of the amount credited to it from the operations of Terminal in 1962.

As already stated, the written contract for the sale of Reading's interest in Terminal to B&O was executed as of April 30, 1963. Interestingly, in April, 1964, the first of the five annual installments in the amount of $180,000 was paid in cash, plus $27,000 representing 3% of $900,000. At the same time the balance of the four installments totalling $720,-000 was paid in cash less a pre-payment discount of 5%.

Understandably, the parties at trial and thereafter in their post-trial briefs have focused principally upon the difficult questions of injury and resultant damages claimed by plaintiffs. Thus, the ultimate question to be determined here is whether or not there is a substantial difference between what Reading received for its Terminal stock and notes and what Reading would have received had public bidding been used as required by the statute. Nevertheless, there is a preliminary legal issue which is raised by B&O by leave of this court. In effect, this is another argument by B&O in support of its earlier announced position on the motion for summary judgment that its involvement or non-involvement in this transaction is such to take it out of the ambit of Section 10. Accordingly, the balance of this opinion will be devoted, first, to a discussion of the legal question of coverage raised by B&O and, second, to the legal and factual problems incident to the questions of injury and damages as contended by plaintiffs.

## II.

### Did B&O Violate Section 10?

A. *Prior Proceedings on the Violation Issue*

In the earlier opinion in this action, I denied the joint motion by Reading and B&O for summary judgment which was based primarily on the theory that Section 10 did not prohibit the transaction here in question.[4] In rejecting defendants' theories, it was concluded that this was the type of transaction with which the Congress was concerned when it passed Section 10. Developments at trial confirmed this view, and, in addition, it became clear from the evidence that Congress' concern with common carriers dealing with companies having interlocking directors was fully warranted. The testimony of Kerslake, who negotiated this deal for Reading, is illustrative of the dangers inherent in transactions where personnel of the buyer and seller are intermingled.

As stated heretofore, Kerslake at the time was an officer of the C&O, which was parent of B&O. Because of his position at C&O, he was well acquainted with high level B&O employees, some of whom had occasion to become involved in this transaction. Despite this obvious interest in the affairs of B&O, it was Kerslake who negotiated for Reading in its

---

2. In particular, the cash position of both roads was precarious.

3. The $250 was supposed to represent the nominal value of Reading's 250 shares of capital stock.

4. It was also argued that a violation of Section 10 does not give rise to civil liability for treble damages under Section 4.

sale of Terminal securities to B&O.[5] Assuming that Kerslake negotiated the deal in good faith, which on the basis of his demeanor and testimony I have no reason to doubt, his conflicting relationships with the three railroads may have subconsciously affected his ability to be a staunch negotiator for Reading. It is in the context of these circumstances that B&O's involvement in this transaction must be evaluated.

### B. *B&O's Argument*

Subsequent to the filing of the earlier opinion of October 1, 1968, B&O moved again to dismiss the complaint against it, essentially on the ground that although Section 10 may have prohibited the sale of Terminal securities (and hence Reading and others may have violated the statute), B&O violated no provision of Section 10. In order to properly understand B&O's argument it is necessary to set out the whole of Section 10:

"No common carrier engaged in commerce shall have any dealings in securities supplies, or other articles of commerce, or shall make or have any contracts for construction or maintenance of any kind, to the amount of more than $50,000, in the aggregate, in any one year, with another corporation, firm, partnership, or association when the said common carrier shall have upon its board of directors or as its president, manager, or as its purchasing or selling officer, or agent in the particular transaction, any person who is at the same time a director, manager, or purchasing or selling officer of, or who has any substantial interest in, such other corporation, firm, partnership, or association, unless and except such purchases shall be made from, or such dealings shall be with, the bidder whose bid is the most favorable to such common carrier, to be ascertained by competitive bidding under regulations to be prescribed by rule or otherwise by the Interstate Commerce Commission. No bid shall be received unless the name and address of the bidder or the names and addresses of the officers, directors, and general managers thereof, if the bidder be a corporation, or of the members, if it be a partnership or firm, be given with the bid.

Any person who shall, directly or indirectly, do or attempt to do anything to prevent anyone from bidding, or shall do any act to prevent free and fair competition among the bidders or those desiring to bid, shall be punished as prescribed in this section in the case of an officer or director.

Every such common carrier having any such transactions or making any such purchases shall, within thirty days after making the same, file with the Interstate Commerce Commission a full and detailed statement of the transaction showing the manner of the competitive bidding, who were the bidders, and the names and addresses of the directors and officers of the corporations and the members of the firm or partnership bidding; and whenever the said commission shall, after investigation or hearing, have reason to believe that the law has been violated in and about the said purchases or transactions, it shall transmit all papers and documents and its own views or findings regarding the transaction to the Attorney General.

If any common carrier shall violate this section, it shall be fined not exceeding $25,000; and every such director, agent, manager, or officer thereof who shall have knowingly voted for or directed the act constituting such violation, or who shall have aided or abetted in such violation, shall be deemed guilty of a misdemeanor and shall be fined not exceeding $5,000 or confined in jail not exceeding one year, or both, in the discretion of the court."

B&O's argument is relatively simple. Section 10 is directed at preventing

---

5. I do not take the cynical view, hinted at during trial, that Kerslake was named as Reading's negotiator because of his relationship with C&O and B&O.

transactions like this one without competitive bids, but, it is argued, the Congress attempted to prevent such transactions only by prohibiting certain actions to three specific classes of persons:

1. Common carriers are prohibited from purchasing or selling certain items unless public bids are solicited.

2. Directors, agents, manager or officers of the common carrier are prohibited from knowingly voting for or directing the violation, and from aiding and abetting the violation.

3. "Any person" is prohibited from doing anything directly or indirectly to prevent any third party from bidding or to prevent free and fair competition among bidders.

Since B&O was not the "common carrier" in this transaction,[6] nor was it a director, agent, manager or officer of Reading, B&O argues that the only prohibition in Section 10 which could possibly apply to itself is (3) above, which is contained in paragraph 2 of the statute. It further argues that this paragraph does not apply because it obviously envisions situations where the common carrier has already solicited bids, and "any person" *thereafter* interferes. The conclusion of the argument is that since bids were never solicited by Reading, B&O could not have violated paragraph 2 of Section 10.

### C. *B&O's Violation*

There are two general difficulties with B&O's argument. The first is that B&O takes a narrow, shortsighted view of the applicable antitrust laws, whereas the proper resolution of this controversy requires a broader look at this remedial legislation. The second general difficulty with the argument is that to a certain extent it ignores three facts which have far-reaching impact on this issue: (1) B&O's 42% stock ownership of Reading and admitted control over its affairs; (2) B&O's receipt of the amount of loss suffered by Reading; and (3) the participation of three B&O directors on the board of directors of Reading at the time this transaction was approved by that common carrier.

It is apparent from a reading of Section 10 and its legislative history, see the previous opinion in this case, 291 F.Supp. 456, that the statute's primary purpose was to protect common carriers (and indirectly, the public) from the machinations of corporations with which it had interlocking directors. Although the Supreme Court was discussing a purchase by a carrier rather than a sale, a statement in Minneapolis & St. Louis Railway Co. v. United States, 361 U.S. 173, at 190, 80 S.Ct. 229, at 240, 4 L.Ed. 2d 223 (1959), succinctly makes this point:

> "The evident purpose of § 10 of the Clayton Act was to prohibit a corporation from abusing a carrier by palming off upon its securities, supplies and other articles without competitive bidding and at excessive prices through overreaching by, or other misfeasance of, common directors, to the financial injury of the carrier and the consequent impairment of its ability to serve the public interest." (Footnote omitted.)

Thus, the question is not whether the Congress intended to stop corporations like B&O from overreaching a common carrier like Reading, but whether the language used is sufficient to prohibit B&O from engaging in this transaction.

■ In addition, it is necessary to be constantly mindful that this is a civil treble damage action under Section 4.[7]

---

6. The particular way in which a violation of Section 10 is here alleged to have injured Reading is that Reading's securities in Terminal were sold to B&O at a price less than market value. Thus, for our purposes Reading is the "common carrier" and B&O is "another corporation" under the rubric of Section 10.

7. This fact in itself tends to diminish B&O's argument that Section 10 should be strictly construed since it is a criminal statute.

Besides its purpose to aid the government in its enforcement of the antitrust laws, Section 4 is designed to allow plaintiffs to recover damages suffered as a result of violations of these statutes. In the context of this case, it would be strange indeed if plaintiffs could recover against all persons involved in the transaction except B&O—the entity the actions of which were intended to be stopped by Section 10, which reaped the benefits of the violation, and which had the power to control both buyer and seller. With these preliminary views in mind, I conclude that B&O violated Section 10 in the following ways:

1. B&O, because it controlled Reading, must be held liable for Reading's failure to obtain bids in violation of the first paragraph of Section 10. I am not persuaded to the contrary by B&O's evidence at trial that it did not in fact exercise its control over Reading in this particular transaction.[8] Because it could have exercised its control, B&O had the power to compel Reading to solicit public bids as required. It did not, and its failure is actionable.

2. B&O controlled three Reading directors who voted in favor of this transaction. These three directors "represented" B&O on the Reading board, and B&O must be held liable for their violation of paragraph 4 of Section 10. In this regard it should be noted that B&O was well aware of the transaction in question, knew it had to be approved by both boards of directors, and later participated as a purchaser in the transaction.

3. B&O itself violated paragraph 2 of Section 10. Although I agree that the primary thrust of paragraph 2 is to prohibit interference with bidding procedures once begun, its prohibitions are also transgressed by a corporation which eliminates the bidding process altogether by purchasing the property outright.

4. B&O freely participated in this sale which was "forbidden in the antitrust laws", 15 U.S.C. § 15. Hence, even if it be argued that under *strictissimi juris* construction, B&O cannot be held criminally liable for a violation of one or more provisions of Section 10, it need not necessarily follow that B&O should escape civil liability under Sections 4 and 10. The intent of Section 10 is clearly to prevent a corporation from overreaching a common carrier where it has an opportunity to do so by reason of interlocking directors. B&O engaged in the transaction despite the intended stricture,[9] and but for its involvement, the violation would not have occurred. Under these circumstances, plaintiffs (through and for Reading) must be permitted to recover Reading's losses, if any, under Section 4.

### III.

#### *The Issues of Injury and Resultant Damage to Reading*

The sale price of Reading's Terminal securities was arrived at by valuing the assets of Terminal and ascribing one-half of that value to Reading plus $250. Specifically, the negotiators computed a total asset figure of $2,250,000 in the following manner (Plaintiffs' Exhibit 3):

"The valuation was based upon land and building values as appraised by Albert M. Greenfield & Company of Philadelphia, railroad tracks at book value, and a mortgage obligation of Quaker City Cold Storage Company at face value. As respects that part of the land already under option to the B&O, the option price was applied in-

---

8. The testimony given by certain defense witnesses to the effect that Reading initiated negotiations for the sale of the property to B&O is irrelevant in the context of this case.

9. Although awareness of the statutory provision is not an element under this *malum prohibitum* statute, surely B&O should have been aware of Section 10 because it is itself a common carrier.

stead of the Greenfield appraisal value. The total of these elements was $2,294,746 as follows:

| | |
|---|---|
| Land under option to B&O at option price of $.57 per square ft. | $ 348,298 |
| Other land at Greenfield appraisal value of $1.00 per square ft. | 885,171 |
| Buildings at Greenfield appraisal value | 600,500 |
| Tracks at book value (not included in Greenfield appraisal) | 164,959 |
| Quaker City Cold Storage Co. mortgage (face value) | 295,818 |
| | $2,294,746 |

The above total of $2,294,746 was rounded off to $2,250,000. In recognition of the fact that tracks, while not considered depreciable property, do suffer from loss of useful value from wear and tear, it is felt that the rounded off figure represented a fair value to both parties."

———◆———

Since Reading was ostensibly paid $1,125,250, it can be seen that the negotiating parties assumed in 1963 (and the litigants here seem to assume) that the fair market value of Reading's securities was equal to one-half of the fair market value of the assets of Terminal.

Parenthetically but importantly, it should be observed that a defense witness, Mr. Meltzer, offered testimony to the contrary. In substance, Meltzer said that Reading's one-half interest might be discounted in value, particularly because this one-half interest did not carry with it control over Terminal and its property. Without extended discussion, I am not persuaded by this reasoning. To illustrate, if it be assumed that competitive bids were sought in this sale, almost certainly B&O would have been concerned to submit a sufficiently high bid so as to maintain its control of Terminal. Conversely, a third party may well have been tempted to submit a sufficiently high bid in order to become a joint owner of the property with B&O, exercising at least negative control over operations of the company. In short, it is too easy to conceive of a number of bidding possibilities which almost certainly would require a bid figure equal at least to one-half of the fair market value of Terminal's assets.

■■ As heretofore stated, the ultimate question here is whether there is any substantial difference between what Reading realized for its securities in Terminal and what Reading would have received had public competitive bidding been used as required by the statute. In this litigation, plaintiffs have consistently assumed that public bidding would have resulted in Reading obtaining fair market value for its securities. It might be theoretically argued that public bidding would not have achieved this result. Nevertheless, I infer that the objective of Congress in enacting Section 10 was to enhance the common carrier's chances of getting fair market value for its securities. Furthermore, I am at a loss to conceive that the problem or question of value can be approached in any other meaningful way. Consequently, for purposes of resolving this litigation I adopt the assumption of plaintiffs that the inquiry here is for the fair market value of Reading's Terminal securities in April 1963.

Two other preliminary observations are in order. First, I have understood

the parties to assume, as I do, that the total value of the securities in Terminal is equal to the total value of Terminal's assets. Second, notwithstanding none too subtle hints from the judge during trial, and prior thereto, plaintiffs and their counsel failed or refused to introduce evidence as to the total value of Terminal at the time in question. Rather, plaintiffs chose to break down the assets and analyze each one of them, perhaps because this was the approach in effect used by the negotiators for B&O and Reading in the spring of 1963. The significance of this is that, arguably, the sum of the parts does not equal the whole. Nevertheless, upon appraising all the proofs, I cannot say with certainty that there is any difference of substance between the sum of all the parts and the whole.[10] In other words, for purposes of analysis at least, I accept plaintiffs' approach in an effort to ascertain whether or not Reading sustained injury and resultant damage in the sale of its securities to B&O.

As will hereinafter become clear, I have followed essentially the approach taken by the negotiators for the parties in April, 1963 in computing the fair market value of the securities (or the assets) of Terminal. Despite plaintiffs' argument to the contrary, I accept all of the specific items of valuation except the figure of $885,171 for the so-called "other land"—i. e. the land which was not under option to Schuylkill, the subsidiary of B&O. As will be seen, I find that the other land should have been valued at a figure in excess of $1.00 per square foot. I also conclude that the negotiators made a substantial omission when they failed to include certain receivables of Terminal from B&O and Reading in totaling up the assets as they did. Consequently, I ultimately conclude that the fair market value of the total assets and thus the securities of Terminal in April, 1963 was the sum of $3,147,648. After computing an appropriate set-off of receivables due

to Terminal from Reading and for the value of what Reading actually received, I find that Reading received $554,000 less than they should have received for their securities. Finally, I conclude that contrary to B&O's arguments, Reading sustained injury under the antitrust laws and thus in this derivative action plaintiffs should recover on behalf of Reading treble damages. The following discussion will indicate my specific findings in this area and will treat the principal arguments of the parties on these subjects.

A. *Rails, Ties, Track Fittings, Ballast, etc.*

As in effect indicated heretofore, the B&O and Reading negotiators ascribed a net value for railroad tracks, ties, fittings, ballast and the like of $120,213. This figure was arrived at by taking the book value for these items of $164,959 and subtracting therefrom $44,746 for wear and tear. The Greenfield appraisal did not include any figure for these items. B&O and Reading made no effort to get any professional engineers or other experts to make a specific appraisal of the tracks and related items.

According to Baylis, plaintiffs' expert, these items had a fair replacement value of $534,000. Consequently, plaintiffs seek to add to the total asset figure a sum in excess of $413,000 representing the difference between Baylis' figure and the net figure used by the negotiators.

I am not persuaded that this figure for replacement cost, even if accurate, is relevant. There was testimony to the effect that if the terminal property had been purchased by a third party wishing to modify the property for other uses, the cost of removing the trackage would have been substantial. Even if B&O or some other purchaser had wished to keep the trackage substantially as it was, the replacement cost would not necessarily be relevant. In any event, given the

---

10. The only asset of Terminal which I conclude was undervalued is the unoptioned land, as hereinafter discussed. Thus, this is the only item of damage affected by this conclusion.

various possibilities had bids been taken, I am not convinced by plaintiffs' proof that any value in excess of the amount used by the parties for the trackage would have been realized.

### B. *Ramps and Platforms*

At trial, plaintiffs offered evidence and argued for the proposition that the negotiators erroneously excluded valuations for the platforms and ramps which were located on the property of Terminal. Neither item was included in the Greenfield appraisal, and, of course, they were not considered or credited by the negotiators for B&O and Reading.

According to Baylis' testimony, the two timber and earth-fill platforms covered with macadam had a value in 1963 of $25,000 each or a total of $50,000. He also testified that the valuation of the five concrete platforms was approximately $244,000.

Again, I am not impressed by the plaintiffs' arguments or the supporting testimony for these arguments. In my view, the evidence establishes that the platforms in 1963 were deteriorated, narrow and not adequate for modern freight handling. This is not to say, of course, that the platforms had no utility whatsoever. On the other hand, I find it difficult to infer that a bidder in April, 1963 would have seen fit to ascribe any substantial value to these deteriorated and in some ways inconvenient structures.

My views are similar with regard to the two ramps. To be sure, as Baylis testified, these ramps might have continued to have some utility in respect to, for example, "piggyback" operations. Nevertheless, they were in less than mint condition at the time. For this reason and because one can only speculate as to what use they might offer to a prospective bidder, I am inclined to agree that the negotiators were practically correct in ignoring these two platforms for purposes of crediting assets of value belonging to Terminal.

Moreover, though the evidence is unclear on this point, and the parties seem to have assumed otherwise, I suspect that Meltzer in his appraisal lumped the ramps and platforms under buildings and improvements valued at $600,300. If he did, this would have been a practical solution—and one useful for present purposes.

### C. *Buildings and Other Improvements*

The negotiators for Reading and B&O included the value of $600,500 for buildings and improvements on the property. This value was taken from the Greenfield appraisal without change. Since I do not understand the plaintiffs to raise any issue with respect to this figure, I accept this valuation without further comment.

### D. *Land Valuation*

In the Greenfield appraisal, Meltzer appraised the entire parcel consisting of 1,496,220 square feet, including the 611,049 square feet under option to Schuylkill, at $1,500,000, or an average of approximately $1.00 per square foot. With respect to the portion of the premises under option to Schuylkill, it must be recalled that that option was still in effect on April 30, 1963, and it would continue in effect thereafter until June of that year. Presumably for this reason, plaintiffs, as I understand them, do not challenge or contest an appraisal of the Schuylkill leased portion of the property at the option price of $.57 per square foot. Rather, plaintiffs center their fire on Meltzer's evaluation of $1.00 per square foot for the remaining or unoptioned portion consisting of about 885,171 square feet.

Just before the preparation of the Greenfield appraisal, approximately 14 acres of land located only two blocks away from the Terminal premises were sold by Philadelphia Electric Company to United Parcel Service at a price of $1.50 per square foot for use as a terminal facility. In fact, this particular sale was closed just two days before the date of the Greenfield appraisal. Consequently, plaintiffs have vigorously argued that Meltzer, who admittedly was aware of this United Parcel transaction,

should have appraised the unoptioned portion of the Terminal property at a $1.50 per square foot, because in a free and open market Terminal would have been able to get this price for the unoptioned land.

As I appraise the evidence, plaintiffs' proposed inference is not without persuasive force. In addition to the United Parcel transaction, which was relatively contemporaneous with the crucial sale of securities here involved, I believe that there is other evidence in support of the proposition that the unoptioned portion of the Terminal premises was worth more than $1.00 per square foot. The Terminal property is located adjacent to a main thoroughfare in South Philadelphia known as Delaware Avenue, an eight-lane highway. Not too far distant is a perishable products terminal maintained and operated by the Penn Central Railroad. In the same area are to be found a number of important interchanges of modern interstate highways. The Philadelphia waterfront is just a block or two away from Terminal. In short, the Terminal premises are located in the heart of a very desirable area for purposes of trucking, freight forwarding, freight handling, rail and truck terminal operations, warehousing and the like. This is true today, and it was true in the spring of 1963. Consequently, I conclude that if there had been competitive bidding in 1963 for the securities of Terminal owned by Reading, it is probable that bidders would have valued this unoptioned land at a price in excess of $1.00 per square foot. Under all the circumstances, I find that the unoptioned land was undervalued by $.25 per square foot, and Reading would have realized this amount had public bidding been used.

### E. Quaker City Cold Storage Company Mortgage

The negotiators, of course, appropriately considered as an asset of Terminal a mortgage held by it and known as the Quaker City Cold Storage Company mortgage. Plaintiffs make no issue about the recital of this asset at its face value of $295,618.

### F. Terminal Receivables from B&O and Reading

In April, 1963, the books of Terminal reflected certain receivables of that company from B&O and Reading. In summary, these were as follows (Plaintiffs' Exhibit 6):

| Description | B&O | Reading | Total |
| --- | --- | --- | --- |
| Net Advances | $ 89,842.09 | $101,402.35 | $191,244.44 |
| Depreciation | 451,947.39 | 33,163.61 | 485,111.00 |
| Totals | $541,789.48 | $134,565.96 | $676,355.44 |

The negotiators effectively ignored these receivables in computing the total assets of Terminal in April, 1963.[11] At the trial, Mr. Roger Brown, who in the spring of 1963 was an officer of C&O on loan to B&O and one of the negotiators of B&O with Reading, testified that the reason that the depreciation receivables at least were disregarded, and properly so in his view, was because they were not payable in cash. His testimony is discredited by documentary evidence to the effect that B&O and Reading had specifically agreed that in order to reconcile Reading's comparatively minor use of the terminal despite its 50% invest-

11. In Pl. 1, the agreement of sale, the receivables from Reading, but not from B&O, are mentioned and deducted in theory from the total face amount of Reading's notes, $2,000,000. In fact, no other recognition was accorded to the receivables in the negotiations and final price.

ment therein, the device of cash charges representing allocations of depreciation according to relative use of the facility was to be used. Specifically, it appears that as far back as in 1943, B&O, Reading and Terminal had agreed substantially as follows (Plaintiffs' Exhibit 13):

> "As the B&O and Reading have invested equal amounts in the property, the Reading being the minority user, the portion of the unaccrued loss, representing the excess use of the property by the B&O and consequently the smaller use by the Reading, as compared with the amount invested by each road, will be collected from the B&O by the (Terminal) and paid by it in cash to the Reading."

For this and other reasons, I accept plaintiffs arguments that the omission of the receivables for depreciation and advances in the computation of value was a significant and unwarranted exclusion. There is evidence that both B&O and Reading used the depreciation charges as deductions for income tax purposes. There is also evidence that the receivables on the books of Terminal were carried as payable on the books of the two railroads. Also, interestingly enough, after the closing and in June, 1963, Reading received cash for certain accruals from Terminal during the first four months of 1963, against which was charged an amount in the same period. (Plaintiffs' Exhibits 8 and 9).

Finally, I cannot imagine that any competitive bidder in April, 1963 would not have regarded these receivables of Terminal as having a value substantially as carried on the books. Since there is no evidence, save B&O's poor financial situation, to indicate that these receivables should have been valued at less than their face amount,[12] I conclude that the receivables in their entirety should be considered in computing the value of Reading's security interest.

## H. *Valuation of Consideration Received by Reading*

A principal contention of plaintiffs is that Reading in fact did not receive the negotiated price of $1,125,250 for its securities. As stated, Reading received cash in the amount of $225,250 and an unsecured promise of B&O to pay $900,000 over a period of five years with interest at 3%. At trial, plaintiffs' witness, Martin Whitman, a specialist in corporate finance and an officer of Blair & Co., Inc., gave his opinion that the true worth on April 30, 1963 of B&O's unsecured obligation was between $630,000 and $675,000. Thus, plaintiffs urge that Reading actually received only $875,250 for its securities ($225,250 cash plus $650,000 for the unsecured deferred payments totalling $900,000).

In my view, Whitman's evidence is persuasive. Wholly aside from the fact that his testimony was substantially uncontradicted, there is evidence in the record that B&O's secured debt obligations in 1963 were selling around 70% to 75% of par. It is no sufficient answer to point out, as counsel for B&O does, that one year later B&O paid off the balance of the $900,000 less a 5% prepayment discount. Consideration of the financial reliability of the purchaser at the time of purchase is the controlling point. See, e. g., Interstate Commerce Commission Regulations, § 8.3(b), 49 C.F.R. 1010. Concededly, B&O was in poor financial straits in 1963; it was unable to borrow at prime rates then prevailing, and its obligations were not highly regarded by investors or the financial community. Thus, it seems fair to infer that competitive bidding would have assured Reading consideration equal or substantially equal to the nominal, negotiated value of its securities.

Specifically, I determine that a realistic value of B&O's deferred payment commitment to Reading was $660,000.

---

12. Although there was evidence at trial that the value of B&O's unsecured promissory note payable over five years must be discounted, there was no evidence that B&O could not meet its current liabilities.

It follows, then, that Reading actually received $885,250 for its security interest in Terminal.

## IV.

### *Summary*

In recapitulation, and following at least generally the method used by the negotiators in 1963, I find that the fair market value of Reading's security interest in Terminal in April, 1963 was $1,439,258 but that the value of the consideration therefor received from B&O was only $885,250, leaving a deficiency of $554,000.[13] The specific computations are as follows:

| Item | Value |
| --- | --- |
| Land under option to Schuylkill | $ 348,295 |
| Remaining land | 1,106,464 |
| Buildings and improvements | 600,500 |
| Tracks, ties, etc. | 120,213 |
| Quaker City Cold Storage Co. mortgage (face value) | 295,818 |
| Receivables from B&O and Reading | 676,355 |
| Total assets | $3,147,648 |
| ½ Total assets (Reading) | 1,573,824 |
| Less receivables from Reading | 134,566 |
| Adjusted ½ interest | $1,439,258 |
| Less cash received by Reading and value of B&O deferred obligation | 885,250 |
| Deficiency | $ 554,008* |

This deficiency, in my view, permits the ultimate conclusion that Reading did not receive the fair market value of its Terminal securities. That is to say, I conclude that (1) the deficiency is a fair indication of "injury" to Reading as a result of noncompliance with Section 10, and (2) it is a reasonable measure of single damages in the circumstances of this case.

Defense counsel argue strenuously that plaintiffs have failed to prove a clear causal connection between the violation of Section 10 on B&O's part and the injury. Indeed, they argue that there is no persuasive proof of injury. Practically if not legally speaking, the two questions significantly overlap in the context of this case. I agree with defense counsel that the normal rule in civil antitrust cases is that plaintiffs must show a clear causal connection between the statutory violation and the injury claimed. Molinas v. National Basketball Association, 190 F.Supp. 241 at 243 (S.D.N.Y. 1961). I do not agree, however, that this rule imposes the abnormal burden of proof that counsel then would require of plaintiffs in this case.

Having ruled that there was a violation by B&O of Section 10 and determined that Reading received $554,000 less than the fair market value of its Terminal securities, it is not unreasonable, in my view, to infer that Reading stood a good chance of realizing an addi-

13. Obviously, the apparent precision of these figures is the result of the various methods of computation (e. g. book value on trackage) rather than a conclusion on my part that an exact dollar figure for damages is mathematically ascertainable.

* Arbitrarily rounded off to $554,000.

832

tional amount close to that deficiency if its securities had been offered through public competitive bidding. Defense counsel, of course, make much of the point that we cannot know what would have happened if Section 10 had been followed to the letter. That argument proves too much. In effect, B&O would have plaintiffs " * * * bear the risk of the uncertainty which (its) own wrong has created". Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, at 265–266, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1945). By analogy to the typical rule in price fixing conspiracies under the Sherman Act, see, e. g., Ohio Valley Electric Corp. v. General Electric Company, 244 F.Supp. 914, at 933 (S.D.N.Y. 1965), I find that the evidence in this case makes it reasonable to regard the deficiency in fair market value of Reading's securities to constitute both the injury to Reading and the measure of its resultant damages.

Accordingly, a judgment should be ultimately entered awarding damages of $554,000 trebled for the benefit of Reading. Before such a judgment is entered, however, counsel for the parties are directed to arrange with my chambers a hearing date for submission and resolution of the issue of attorneys' fees.