**Ethel FISCHER and Herbert Bonime, Plaintiffs,**

v.

**CF & I STEEL CORPORATION, Thomas M. Evans, Southern Pacific Company and Southern Pacific Transportation Company, Defendants.**

**Mary MAYER, Plaintiff,**

v.

**CF & I STEEL CORPORATION, Thomas M. Evans, Southern Pacific Company and Southern Pacific Transportation Company, Defendants.**

**Nos. 82 Civ. 5424 (MEL), 82 Civ. 6159 (MEL).**

United States District Court, S.D. New York.

April 14, 1987.

Certification Granted June 5, 1987.

Milberg Weiss Bershad Specthrie & Lerach, Lowey Dannenberg & Knapp, Wolf Popper Ross Wolf & Jones, New York City, for plaintiffs; Richard M. Meyer, Henry A. Brachtl, Steven L. Wittels, Robert Skirnick, Richard B. Dannenberg, Ellen Chapnick, of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants Thomas M. Evans and CF & I Steel Corp.; Edward N. Costikyan, Steven E. Landers, Howard A. Smith, of counsel.

LASKER, District Judge.

Plaintiffs in this class action are former shareholders of Southern Pacific Company ("Southern Pacific") who seek to recover treble damages from defendants CF & I Steel Corporation ("CF & I") and Thomas M. Evans for violations of Section 10 of the Clayton Act, 15 U.S.C. § 20 (1982). They move, pursuant to Fed.R.Civ.P. 56(a), for partial summary judgment on the issue of liability. The defendants cross-move, pursuant to Fed.R.Civ.P. 12(c), for judgment on the pleadings dismissing the amended complaint. Both motions are denied.

The basic facts are not in dispute. Plaintiffs allege that Section 10 of the Clayton Act was violated when between 1978 and 1981 Southern Pacific Transportation Company ("SPTC"), a common carrier and wholly owned subsidiary of Southern Pacific Company ("Southern Pacific"), purchased over $71.5 million in steel rail and rail products from CF & I without having employed competitive bidding procedures. Section 10 requires the use of competitive bidding in accordance with Interstate Commerce Commission regulations when a common carrier proposes to enter into contracts for securities, services, or supplies in an amount over $50,000 in a single year with another corporation if the carrier has on its board of directors any person who at the same time is a director or has any substantial interest in the other corporations.[1] During the period 1978 through

---

1. Section 10 is here set out in its entirety:
   Purchases by common carriers in case of interlocking directorates, etc.

   No common carrier engaged in commerce shall have any dealings in securities, supplies, or other articles of commerce, or shall make or

1981, defendant Evans was simultaneously a director of Southern Pacific, a director of SPTC, and Chairman of the Board, Chief Executive Officer, and a 10% shareholder in Crane Co. ("Crane"), which owned 96.3% of CF & I. During the relevant period four of CF & I's directors, including Evans' son, were also directors and officers of Crane.

This suit was originally brought as a shareholder double-derivative action on behalf of Southern Pacific and SPTC. Subsequently, Southern Pacific merged with Santa Fe Industries to form a new holding company, Santa Fe Southern Pacific Corporation, and each share of outstanding Southern Pacific common stock at the time of the merger was converted into 1.543 shares of the new corporation's common stock. As a result of Southern Pacific's having been merged out of existence, plaintiffs were found to lack standing to pursue the derivative suit. *See Fischer v. CF & I Steel Corp.*, 599 F.Supp. 340 (S.D.N.Y. 1984). Thereafter the court granted plaintiffs leave to amend their complaint to pursue the action as a class action. *See Fischer v. CF & I Steel Corp.*, 614 F.Supp. 450 (S.D.N.Y.1985). The proposed class consists of those persons who were Southern Pacific shareholders at the time of the merger.

Plaintiffs contend that they are entitled to summary judgment as a matter of law that CF & I and Evans violated Section 10 of the Clayton Act because they claim it is not disputed that SPTC engaged in transactions with CF & I which, absent competitive bidding, were prohibited by the statute during the time Evans, then a director of Southern Pacific and SPTC, held almost a 10% interest in CF & I. Plaintiffs have submitted proxy statement disclosures made by Southern Pacific pursuant to Section 14 of the Securities Exchange Act of 1934 and pertinent regulations which contain what they argue are almost all the facts about SPTC's purchases from CF & I and Evans' interrelationships with Southern Pacific, SPTC, Crane, and CF & I which are material to a determination of liability. Plaintiffs estimate that because of the differential between domestic and foreign steel prices during the period at issue, competitive bidding could have saved SPTC over $7 million on the purchases it made from CF & I—cost savings which would have been translated into the finely calculated exchange ratio negotiated in connection with the 1983 merger agreement. As

---

have any contracts for construction or maintenance of any kind, to the amount of more than $50,000, in the aggregate, in any one year, with another corporation, firm, partnership, or association when the said common carrier shall have upon its board of directors or as its president, manager, or as its purchasing or selling officer, or agent in the particular transaction, any person who is at the same time a director, manager, or purchasing or selling officer of, or who has any substantial interest in, such other corporation, firm, partnership, or association, unless and except such purchases shall be made from, or such dealings shall be with, the bidder whose bid is the most favorable to such common carrier, to be ascertained by competitive bidding under regulations to be prescribed by rule or otherwise by the Interstate Commerce Commission. No bid shall be received unless the name and address of the bidder or the names and addresses of the officers, directors, and general managers thereof, if the bidder be a corporation, or of the members, if it be a partnership or firm, be given with the bid.

Any person who shall, directly or indirectly, do or attempt to do anything to prevent anyone from bidding, or shall do any act to prevent free and fair competition among the bidders or those desiring to bid, shall be punished as pre-

scribed in this section in the case of an officer or director.

Every such common carrier having any such transactions or making any such purchases shall, within thirty days after making the same, file with the Interstate Commerce Commission a full and detailed statement of the transaction showing the manner of the competitive bidding, who were the bidders, and the names and addresses of the directors and officers of the corporations and the members of the firm or partnership bidding; and whenever the said commission shall, after investigation or hearing, have reason to believe that the law has been violated in and about the said purchases or transactions, it shall transmit all papers and documents and its own views or findings regarding the transaction to the Attorney General.

If any common carrier shall violate this section, it shall be fined not exceeding $25,000; and every such director, agent, manager, or officer thereof who shall have knowingly voted for or directed the act constituting such violation, or who shall have aided or abetted in such violation, shall be deemed guilty of a misdemeanor and shall be fined not exceeding $5,000 or confined in jail not exceeding one year, or both, in the discretion of the court.
15 U.S.C. § 20 (1982).

evidence of the availability of lower-priced foreign-manufactured steel during 1978–81, plaintiffs point to contemporaneous news reports and documents submitted by CF & I itself to the Commerce Department regarding dumping by European and Japanese producers. They move for summary judgment as to liability only, leaving the determination of the extent of damages for further proceedings.

Defendants cross-move for judgment on the pleadings on the ground that plaintiffs have failed to state a claim against CF & I and Evans under Section 10. They contend that neither a director of the carrier nor a supplier can be held liable under the statute without some allegation of culpable conduct addressed by the statute, such as active participation in or influence over the carrier's decision to forgo competitive bidding. Defendants argue that although Section 10's first paragraph may impose liability upon carriers, to whom it is directed, on the basis of the consummation of a prohibited transaction alone, to state a claim against directors or others it is necessary to allege the kinds of actions—such as preventing competitive bidding or voting for or directing the act constituting a Section 10 violation—which are described in the second and fourth paragraphs of the statute. According to defendants, not only have plaintiffs failed to allege any overreaching or interference by CF & I and Evans but a number of factors—such as the supply relationship between SPTC and CF & I dating back to 1949, the product type, quality, and availability justifications for purchasing from CF & I, the fact that the prices paid to CF & I were published and the same as those charged to other purchasers, and the complete lack of involvement of the Southern Pacific and SPTC directors in the purchasing decisions made by SPTC—preclude a finding that the disputed purchases were the result of any malfeasance by CF & I or Evans.

In addition to moving for judgment on the pleadings, defendants oppose plaintiffs' motion for partial summary judgment on two grounds. First, it is argued that to establish liability under the Clayton Act it must be shown that plaintiff suffered an injury in fact. Not only do defendants hotly dispute that SPTC could have satisfied its steel rail needs at prices lower than it paid to CF & I had it used competitive bidding during the period in question, but they also characterize as highly speculative—if not impossible—that SPTC's saving of $7 million before taxes between 1978 and 1981 could have affected the 1983 merger agreement's exchange ratio for the stock of SPTC's $5.98 billion parent company, Southern Pacific. Second, defendants argue that whether Evans possessed the statutorily required "substantial interest" in CF & I is a question of fact which depends on his being found to have exercised some influence or control over CF & I's affairs in general and its rail marketing activities in particular.

The motions at hand present three questions:

(1) Have plaintiffs stated a claim under Clayton Act Section 10 against CF & I and Evans?

(2) Does the evidence submitted establish beyond dispute that plaintiffs have suffered the injury in fact required as a matter of law to establish antitrust liability?

(3) Does the evidence of record establish beyond dispute that Evans had a "substantial interest," as that term is used in Section 10, in CF & I?

If the answer to the first question is yes, defendants' motion for judgment on the pleadings must be denied. If the answer to either the second or third questions is no, plaintiffs' motion for partial summary judgment must also be denied.

(1)

Defendants make a persuasive argument that even were SPTC found to have failed to comply with the prophylactic competitive bidding rule embodied in Section 10's first paragraph—a provision which by its terms appears to prohibit or regulate the conduct of carriers only—CF & I and Evans could not be held to have violated the statute without some showing that they had engaged in some conduct proscribed by the provisions of the statute

addressed to suppliers and directors. A private treble-damage action against CF & I and Evans must be based, the argument runs, on the second and fourth paragraphs of Section 10, since only these parts of the statute are addressed to persons other than the carrier. Those paragraphs make it a criminal offense for "[a]ny person ... directly or indirectly [to] do or attempt to do anything to prevent anyone from bidding, or [to] do any act to prevent free and fair competition among the bidders or those desiring to bid," 15 U.S.C. § 20, ¶ 2, and for any "director, agent, manager, or officer [of the common carrier to] knowingly vote[ ] for or direct[ ] the act constituting [a] violation [of the statute], or ... aid[ ] or abet[ ] in such violation," *id.* at ¶ 4. In defendants' view, to hold Evans and CF & I responsible for SPTC's transgression of Section 10's first paragraph without any showing, or even allegation, that either defendant prevented or hindered competitive bidding, voted for or directed the unlawful purchases, or otherwise assisted in the violation of the statute would amount to the imposition on them of vicarious liability for the carrier's acts.

The reasoning expressed above is logical and is not inconsistent with the wording and structure of the statute. Moreover, the reading of Section 10 urged by defendants is in accord with the Supreme Court's instruction that it is a criminal statute which is to be strictly construed. *See United States v. Boston & Maine R.R.*, 380 U.S. 157, 160, 85 S.Ct. 868, 870, 13 L.Ed.2d 728 (1965). Such a construction is also not at odds with

[t]he evident purpose of § 10 of the Clayton Act ... to prohibit a corporation from abusing a carrier by palming off upon it securities, supplies and other articles without competitive bidding and at excessive prices through overreaching by, or other misfeasance of, common directors, to the financial injury of the carrier and the consequent impairment of its ability to serve the public interest, *Minneapolis & St. Louis Ry. Co. v. United States,* 361 U.S. 173, 190, 80 S.Ct. 229, 239, 4 L.Ed.2d 223 (1959), in that the purpose described by the court might in some measure be achieved by holding suppliers and common directors civilly liable only for conduct specifically proscribed by the second and fourth paragraphs of Section 10 rather than for their involvement, without more, in a transaction prohibited by the first paragraph of the statute.

Notwithstanding these considerations, a determination that the complaint in this case does state a claim is compelled by the decision of the Court of Appeals of this circuit in *Klinger v. Baltimore & Ohio R.R. Co.,* 432 F.2d 506 (2d Cir.1970). *Klinger* was a shareholder derivative action brought on behalf of the Reading Company ("Reading"), a common carrier, against the Baltimore & Ohio Railroad Company ("B & O"), seeking treble damages under Section 10 on account of B & O's having purchased Reading's one-half interest in a jointly-owned fruit and produce terminal without competitive bidding at a time when B & O and Reading had three common directors. Then-Chief Judge Lumbard, writing for a divided panel,[2]

---

**2.** Chief Judge Lumbard found that the transaction came within Section 10 and that B & O violated a duty imposed by the statute, but concluded that B & O was not liable because it had sustained its burden at trial of showing that Reading suffered no injury in fact caused by the absence of competitive bidding. *Klinger,* 432 F.2d at 508–16. Judge Friendly, concurring, agreed that plaintiffs had failed to establish injury, but differed with the Chief Judge as to Section 10's application to the particular facts of the case. *Id.* at 516–19. Judge Friendly characterized Section 10 as "a narrowly drawn statute designed to meet a particular set of experienced evils," *id.* at 516, and stated that "[a] court should not apply a prohibitory statute in a manner that would make it a trap for persons who

have been dealing in good faith," *id.* at 517. Judge Friendly did not, however, reach the question of the statute's application to parties other than the carrier. His specific concerns were (1) that the statute's reference to "securities" was limited to the sale of a carrier's *own* securities and (2) that "Congress did not mean to require competitive bidding in the case of 'securities' which represented a share in a joint venture with an affiliated railroad and by their very nature could not be expected to elicit a substantial competitive bid." *Id.* at 518. Judge Hays, dissenting, agreed with the Chief Judge that "B & O violated a duty imposed upon it by Section 10 when it purchased Reading's interest in the terminal land and facilities without com-

found that "the transaction fell squarely within the prohibition of the statute." *Id.* at 511. B & O had argued that civil liability under Section 10 "reaches only to the violating carrier, its officers and directors, and any party that interferes with the competitive bidding process, not to the interlocked corporation," and contended that since "Reading initiated the transaction and there was no proof of any interference by B & O, ... it ha[d] no liability under the statute." *Id.*

Chief Judge Lumbard framed the issue as "whether Section 10 imposes a duty upon any interlocked corporation dealing with a common carrier not to deal with that carrier except through competitive bidding" and concluded that it does, "that civil liability is imposed on one in B & O's position." *Klinger*, 432 F.2d at 512. Judge Lumbard described the contents of the statute's three operative paragraphs and stated:

> B & O would have us read civil liability as coextensive with the criminal proscription, and it gains some support for this argument from the fact that as written, the first paragraph only talks to the common carrier; it does not explicitly impose any correlative duty on the other party to the transaction. But we think that the statute does impose such a duty, and that civil liability, if it is to be effective as a deterrent, must reach both parties to the transaction.
>
> In discussing the bill, witnesses and Congressmen repeatedly pictured the principal villain in an interlock as the other corporation, with the common carrier being bested in the transaction.
>
> . . . .
>
> It would be anomalous if the statutory duty were to be imposed only on the weaker party to the deal. Thus, we hold that by participating in the transaction B

& O has violated a duty imposed by Section 10 and so is potentially liable. *Id.* (footnote omitted). Judge Hays, dissenting on other grounds, explicitly agreed with Chief Judge Lumbard's analysis, while Judge Friendly did not reach the precise question in his separate concurrence. Thus, it is fair to say that the Court of Appeals considered and rejected in *Klinger* the very argument raised by defendants in support of dismissal in this case.

Defendants contend that *Klinger* is not controlling in this case. They argue that it is distinguishable on its facts, that its broad holding regarding the liability of the interlocking corporation was unnecessary to the decision of the case, that to the extent that it held the statute to impose vicarious liability it was wrongly decided, and that it said nothing about director liability and thus cannot apply to Evans.

It is true that *Klinger* involved stronger facts for the imposition of liability on directors and parties dealing with the carrier than the instant case. In *Klinger* the district court had made findings that B & O owned 42% of Reading's stock, that B & O controlled Reading, that it had the power (even if it did not exercise it) to compel Reading to solicit public bids, that it controlled three Reading directors who actually voted in favor of the transaction in question, and that the individual who negotiated the transaction on behalf of Reading was an officer of B & O's parent company. *Klinger v. Rose*, 302 F.Supp. 818, 822, 824–25 (S.D.N.Y.1969), *rev'd sub nom. Klinger v. Baltimore & Ohio R.R. Co.*, 432 F.2d 506 (2d Cir.1970).[3] Nevertheless, I read the Court of Appeals' decision in *Klinger* to state a rule of wider applicability than to the facts of the particular case. Chief Judge Lumbard's opinion did not rest its conclusions on any finding of interference or other active manipulation by B & O, and

---

petitive bidding," *id.* at 519, but went beyond his brethren in finding that injury had been shown at trial, *id.* at 520–21.

**3.** Although the district court made these findings, it did not determine—after a trial—that B & O engaged in any intentional overreaching of Reading. Rather, Judge Tyler concluded that

Section 10 is a *malum prohibitum* statute, *Klinger*, 302 F.Supp. at 825 n. 9, and that a corporation can violate its second paragraph (which prohibits interference with competitive bidding) simply by engaging with a carrier in a transaction which is not the product of such bidding procedures, *id.* at 825.

*Klinger* is not therefore distinguishable from the instant case in its operative facts. Moreover, even if the *Klinger* holding were *dicta* for the reasons urged by defendants, such a pronouncement would still serve as powerful guidance for lower courts in interpreting this rarely construed statute.

Defendants have presented no sufficient reason for departing from the reasoned conclusions of Judges Tyler, Lumbard, and Hays on this question, all of whom had before them the same legislative history and sparse judicial discussions of Section 10 to which the parties have referred in this case. Finally, although defendants correctly point out that *Klinger* did not consider the liability of common or interested directors in this situation, defendants have not suggested any rationale for treating directors implicated by the statute any differently from suppliers under the *Klinger* holding.

Accordingly, the answer to the first question is that plaintiffs have stated a claim under Section 10 of the Clayton Act against CF & I and Evans, and defendants' motion for judgment on the pleadings is denied.

(2)

■ The next question is whether the evidence of record establishes that plaintiffs have suffered an injury in fact as a result of defendants' violation of the Clayton Act. If so, plaintiffs would be entitled to summary judgment on the issue of liability. To establish liability under Section 4 of the Clayton Act, a private civil plaintiff seeking treble damages must prove more than a formal violation of the antitrust law, "since such proof establishes only that injury may result," *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 562, 101 S.Ct. 1923, 1927, 68 L.Ed.2d 442 (1981) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 486, 97 S.Ct. 690, 696, 50 L.Ed.2d 701 (1977)). Because Section 4 of the Clayton Act

> provides treble damages to "[a]ny person who *shall be injured* in his business or property by reason of anything forbidden in the antitrust laws...." (Emphasis supplied.), [t]o recover treble damages

> ... a plaintiff must make some showing of actual injury attributable to something the antitrust laws were designed to prevent.

*J. Truett Payne Co.*, 451 U.S. at 562, 101 S.Ct. at 1927.

Indeed, it was the absence of proof of injury upon which the Court of Appeals in *Klinger* based its decision that the complaint should be dismissed. *See Klinger*, 432 F.2d at 512–16 (Lumbard, C.J.); *id.* at 518–19 (Friendly, J., concurring). In the *Klinger* case, which reached the Court of Appeals in the posture of an appeal from a final judgment entered after trial on the merits, Chief Judge Lumbard appeared to rule that the defendants should bear the ultimate burden of persuading the court that the plaintiff suffered no injury. *Id.* at 516. Where, as here, however, the issue is raised on a motion by plaintiffs for summary judgment, "the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Insur. Co.*, 804 F.2d 9, 11 (2d Cir.1986) (citing *Anderson v. Liberty Lobby, Inc.*, —— U.S. ——, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986)), *cert. denied*, —— U.S. ——, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). Summary judgment cannot be granted to plaintiffs unless, drawing all reasonable inferences against them, there is no genuine issue as to any fact which is material to their entitlement to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). On the other hand, "summary judgment ... may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages." *Id.*

■ Plaintiffs contend that during the relevant period steel rail and rail products were available from foreign manufacturers at prices below those charged by CF & I and that SPTC could have met its needs from foreign sources had it employed competitive bidding. In support of their position, plaintiffs offer the following evidence:

> —newspaper and magazine articles reporting on the price differential be-

tween domestic and foreign steel and the increases in the share of the American market for steel railroad rail and rail products achieved by foreign producers;[4]

—CF & I's petition to the Commerce Department in 1982 for the imposition of sanctions against British and French competitors for selling steel rail below cost in CF & I's market, specifically in connection with its losing bid for the contract to supply rail to the Portland, Oregon transit system;[5] and

—a 1978 letter and memorandum from CF & I to the Commerce Department detailing the price advantage (including transportation and importing costs) of standard tee rail imported from Japan over that available from CF & I and explaining that the three then-existing domestic steel rail producers were all capable of rolling the highest quality, high performance rails required by the railroad industry.[6]

Plaintiffs argue that CF & I's admitted inability to meet foreign competition demonstrates that competitive bidding would have yielded substantial savings to SPTC and that such savings would have translated into a more favorable exchange ratio for Southern Pacific stock at the time Southern Pacific merged with Santa Fe Industries.

Defendants contend that the evidence submitted by plaintiffs is inadequate to support a finding of actual injury. They point out, first, that plaintiffs have not shown that the particular types of rail and rail products of the quality required by SPTC were available from foreign sources at lower prices than those published by CF & I or that if such rail existed it would have been available on terms which would have accommodated SPTC's practice of purchasing on an "as needed" basis.[7]

Second, defendants argue that this suit is no longer a shareholder derivative action, in which it might suffice merely to show that SPTC could have saved money had it employed competitive bidding. Rather, defendants assert, plaintiffs are now suing as stockholders, claiming that the value of their stock at the time of the merger of Southern Pacific and Santa Fe Industries was diminished because Southern Pacific was a less valuable company than it would have been had it enjoyed the savings that would have resulted from competitive bidding. Defendants contend that plaintiffs have offered no evidence that the exchange ratio by which their Southern Pacific stock was converted into the stock of the new company would have been different even if SPTC had saved the $7 million plaintiffs have estimated would have resulted from competitive bidding. It is argued that even assuming that the suggested savings of pre-tax dollars remained on SPTC's books at the time of the merger, $7 million would have represented only about one-tenth of

4. Exhibit 1 to Affidavit of Richard M. Meyer (Dec. 17, 1985).

5. Exhibit 2 to Affidavit of Richard M. Meyer (Dec. 17, 1985).

6. Exhibit E to Affidavit of Richard M. Meyer (March 3, 1986).

7. Defendants have submitted an affidavit by their attorney, Edward N. Costikyan, which contains a detailed discussion of SPTC's specialized rail needs, its program of testing new types of rail available from foreign and domestic suppliers during the period in question, the reasons for SPTC's practice of purchasing rail on an "as needed" basis, and the difficulties encountered in making such purchases from foreign suppliers. Affidavit of Edward N. Costikyan at 6–12 & Exhibit A (Feb. 7, 1986). This portion of the Costikyan affidavit states that it is "based upon interviews ... conducted with former purchasing officers of the Railroad, as confirmed and supplemented by attorneys for Southern Pacific," id. at 5.

Plaintiffs point out that the Costikyan affidavit is not in accord with the prescription in Fed.R. Civ.P. 56(e) that "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." However, even if only plaintiffs' evidence were before the court on this motion, it would still, by its general and anecdotal nature, leave the question of actual injury unsettled. Moreover, any infirmity in defendants' principal affidavit opposing the motion for summary judgment is of less concern at this point in the litigation, where there has been no discovery on the issue of whether foreign suppliers could have met SPTC's needs during the relevant period. See Fed.R.Civ.P. 56(f).

one percent of Southern Pacific's $5.98 *billion* in assets—an amount which would have been *de minimis* amid the numerous factors that went into calculating the exchange ratio.

I conclude that plaintiffs have not demonstrated that they are entitled to judgment as a matter of law. There are genuine issues of fact both as to availability of foreign rail to satisfy SPTC's specialized needs during the 1978–81 period and the impact of any estimated savings on the exchange ratio for Southern Pacific stock. Resolution of these disputed issues must await discovery and, perhaps, a trial.

(3)

■ Because plaintiffs' motion for partial summary judgment on the issue of liability is denied, it is not necessary to consider in depth the third question—whether Evans had a "substantial interest" in CF & I, as required for a finding of liability under Section 10 of the Clayton Act. The question of Evans' "substantial interest" in CF & I is much closer to a pure matter of law than the injury in fact issue, since there is apparently no factual dispute over the extent of Evans' holdings in Crane and Crane's ownership of CF & I during the relevant period.

Defendants argue that Evans cannot be found to have had a "substantial interest" in CF & I unless it can be shown that he exercised direct control or influence over CF & I's affairs in general and its rail marketing activities in particular, and they have offered evidence that he did not exercise such control.[8] Defendants also point out that the Conference Committee that considered the Senate version of Section 10 changed the words, "direct or indirect interest," to the current "substantial interest," *see United States v. Boston & Maine R.R.*, 380 U.S. 157, 160–61, 85 S.Ct. 868, 870, 13 L.Ed.2d 728 (1965), and that Evans' indirect interest in CF & I is thus not the kind of interest Congress intended would trigger liability under the statute.

Although it is unnecessary to decide the issue at this time, I find that a 9½ percent ownership interest—even if indirect—might well come within the meaning of the phrase, "substantial interest." Defendants' argument that "substantial interest in" means the exercise of control or influence over the other corporation not only appears to take the words well beyond their ordinary meaning but also confuses Section 10's purpose—to avoid situations in which interlocked directors exert improper influence—with a means to its achievement—to prohibit transactions having certain characteristics that make such influence more likely. Indeed, if we understand it correctly, defendants' position in this regard seems inconsistent with their earlier argument that liability of suppliers and directors under the second and fourth paragraphs of Section 10 should not be premised on a carrier's violation of the first paragraph, since defendants are here contending that only the kind of control that would support liability under the second and fourth paragraphs can trigger the prophylactic effect of the first paragraph of the statute. As the Supreme Court stated in *Boston & Maine R.R.*, "If the rule of strict construction is to be followed, the words 'substantial interest in,' as used in § 10, presuppose … an existing investment of some kind in [the other firm]…." 380 U.S. at 162, 85 S.Ct. at 871. As to the Conference Committee's change away from the wording, "direct or indirect interest," neither party has offered any indication in the legislative history why the modification was made. It remains only to observe that even indirect interests can be substantial.

\*   \*   \*   \*   \*   \*

For the reasons discussed above, defendants' motion for judgment on the pleadings and plaintiffs' motion for partial summary judgment on the issue of liability are denied.

It is so ordered.

---

**8.** Affidavit of Thomas M. Evans (Jan. 31, 1986).