Charlotte **KLINGER** and Eric Klinger Plaintiffs-Appellees,

v.

The **BALTIMORE AND OHIO RAIL-ROAD COMPANY,** Defendant-Appellant,

and

**Edward C. Rose et al., Defendants.**

**Nos. 398–399, Dockets 34086–34110.**

United States Court of Appeals, Second Circuit.

Argued Jan. 8, 1970.

Decided Sept. 30, 1970.

Sidney B. Silverman, New York City, (Abraham L. Pomerantz, William E. Haudek, and Robert B. Block, New York City, on the brief), for plaintiffs-appellees.

Eugene Z. DuBose, New York City, (Alexander & Green, John L. Rogers, Jr., Baltimore, Md., David S. Pennock and Kenneth P. Carroll, New York City, on the brief), for defendant-appellant.

Before LUMBARD, Chief Judge, and FRIENDLY and HAYS, Circuit Judges.

LUMBARD, Chief Judge:

Plaintiffs, the owners of both common and preferred stock of the Reading Company, a common carrier, brought this derivative action on behalf of Reading against the Baltimore and Ohio Railroad Company (B & O) and certain individuals who were directors of Reading in April 1963.[1] Jurisdiction was properly based on Section 4 of the Clayton Act, 15 U.S.C. § 15 (1964). Plaintiffs sought trebled damages against B & O, claiming that B & O violated Section 10 of the Clayton Act, 15 U.S.C. § 20 (1964), when it purchased Reading's half-interest in a jointly-owned produce terminal in Philadelphia in 1963. Sitting without a jury, Judge Tyler gave judgment for the plaintiffs in the trebled amount of $1,662,000, having found actual damages of $554,000; he also ordered that B & O pay Reading an additional $220,000 as reasonable attorney's fees. We reverse and remand with instructions that the complaint be dismissed.

The facts of this case are essentially not in dispute. The transaction giving rise to this suit is Reading's sale to B & O, on April 30, 1963, of securities representing its half-interest in the Philadelphia Products Terminal Company (Terminal). At the time of the

1. The individual defendants were never served, and the action was discontinued as to them.

sale B & O and Reading had three common directors, and B & O owned approximately 42% of Reading's equity. The sale was made without competitive bidding, allegedly in violation of Section 10. Plaintiffs claim that the consideration was inadequate and brought this action, seeking as damages under Section 4 triple the difference betwen the actual value of the interest and what was received.

Late in 1925, Reading and B & O had agreed in general terms to acquire land and assemble thereon a joint fruit and produce terminal in South Philadelphia, Pennsylvania. The land was to be assembled with each railroad contributing 50% of the cost thereof and 50% of the cost of construction of the terminal facilities. The two railroads eventually decided to form a new company to take title to the terminal property. Thus, the Terminal was formed as a holding company; Reading and B & O were each issued 250 shares of the capital stock.

Written documents evidencing the agreements between the parties and Terminal were finally executed on December 22, 1931. Under the terms of an operating agreement between B & O and Reading, each company made capital contributions in equal shares with the understanding that profits and depreciation costs were to be shared on a user basis. The three-party contract between the two railroads and Terminal provided, inter alia, that the two railroads would have the use of the terminal as a joint facility and would receive all income and revenues therefrom as if title to the property and Terminal were vested in them.

From December 1931 until April 30, 1963, all the directors and officers of Terminal were officers, directors, employees and lawyers of B & O and Reading. In the initial period of operation of Terminal, both railroads made advances to Terminal, each in the total amount of $2,000,000. In 1936, notes were issued to evidence these advances, with Reading and B & O each receiving $2,000,000 in face amount of Terminal demand notes.

Sometime in the early summer of 1962, representatives of Reading and B & O began discussions about the possibility of B & O acquiring Reading's interest in Terminal. At the time of the initiation of these discussions, B & O owned approximately 42% of Reading's stock, and the two roads had three common directors. No representive of either railroad discussed or even considered possible application of Section 10 of the Clayton Act to this sale. Neither Reading nor B & O ever made any attempt to determine whether a third party would be interested, and, apparently, none of the railroad officials involved thought this property could possibly be of any interest to anyone other than B & O.

The fair market value of the land and improvements of Terminal was determined by an appraiser to be $2,100,000. After some negotiating the parties accepted this figure as a fair price, and to it added some additional items, as will be discussed later, bringing the price to a rounded figure of $2,250,000. They had previously determined that the price to be paid for Reading's interest would be one-half of the value of Terminal, or $1,125,250. The final terms called for a cash down payment at closing of $225,250, with the balance of $900,000 to be paid in five equal installments bearing interest of 3%. The agreement was executed on April 30, 1963 with the down payment made, and in April 1964, when the first installment of $180,000 plus 3% interest was due, it was paid along with the entire balance less a 5% prepayment discount.

I.

The B & O renews a series of arguments, rejected by the court below, that Section 10 does not prohibit the transaction here in question. In pertinent part the section provides:

"No common carrier engaged in commerce shall have *any dealings in securities, supplies, or other articles of*

*commerce, . . .* to the amount of more than $50,000, in the aggregate, in any one year, with another corporation, firm, partnership, or association when the said common carrier shall have upon its board of directors or as its president, manager, or as its purchasing or selling officer, or agent in the particular transaction, any person who is at the same time a director, manager, or purchasing or selling officer of, or who has any substantial interest in, such other corporation, firm, partnership, or association, unless and except such purchases shall be made from, or such dealings shall be with, the bidder whose bid is the most favorable to such common carrier, to be ascertained by competitive bidding under regulations to be prescribed by rule or otherwise by the Interstate Commerce Commission. * * *" (Emphasis added)

B & O first argues that the sale by Reading was not covered by the section, because it was not a "dealing in securities." It argues that Terminal was merely a paper, or dummy, corporation formed to hold mere title to the facilities, and having no duties, no independent employees, and no income. B & O would have us find that although the sale took the form of a transfer of Reading's 250 shares of Terminal stock and certain demand notes, it was in reality only a real estate transaction. We do not agree.

■ The phrase "securities" admittedly is nowhere defined in the Clayton Act, but the notes and shares here certainly fit within any normal and reasonable meaning of the word. B & O argues, however, that Congress' primary reason for including "dealings in securities" in the prohibition was to reach the common abuse where an investment banker with control of a common carrier passes off worthless paper on its captive.[2] But the words are broad enough to cover the collateral abuse of a common

carrier accepting inadequate consideration for securities from the interlocked purchaser. Although the examples of improper transactions to be found in the legislative history are of the first type, we are not persuaded that Congress meant to exclude the sort of transaction presented here since it poses as great a danger.

■ B & O then argues that in fact this was not a securities transaction at all, but merely a sale of real estate, and urges us to look at the substance of the transaction, and not its mere form. But Reading and B & O chose the corporate form, and we think their choice, absent special consideration, should control. This is not a situation where a court will pierce the corporate veil because the corporate form is used to achieve some purpose contrary to public policy. See Schenley Distillers Corp. v. United States, 326 U.S. 432, 66 S.Ct. 247, 90 L.Ed. 181 (1945). Quite the contrary, as Congress here has imposed certain obligations on those who use the corporate form. Reading and B & O chose this mode of organization for Terminal and they must bear the disadvantages as well as the advantages. See Snow Crest Beverages, Inc. v. Recipe Foods, Inc., 147 F.Supp. 907 (D.Mass.1956); Volasco Products Co. v. Lloyd A. Fry Roofing Co., 308 F.2d 383 (6th Cir. 1962), cert. denied, 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963). It is no answer that by liquidating Terminal, distributing the assets, and then selling an undivided half-interest in land, they would not have been dealing in securities. We refuse to infer a Congressional determination that a statute was not meant to cover a certain sort of transaction from the fact that by restructuring the transaction the statute can be avoided.

Alternatively, B & O argues that Section 10 does not apply to transactions between railroads, but only those between a common carrier and another non-railroad corporation. Certainly the

---

2. See, e. g., Hearings on Trust Legislation Before House Comm. on the Judiciary, 63d Cong., 2d Sess. 679–80, 1062 (1913–14).

words of the section—"[n]o common carrier * * * shall have any dealings with another corporation, firm, partnership, or association * * * "—does not compel this result; the phrase "any corporation" would seem intended to include any and all corporate business enterprises.

B & O argues, however, that the legislative history demonstrates that Congress did not intend the section to reach this far. As support, B & O notes that none of the examples in the legislative history involved inter-railroad dealings. But, though we might agree that the primary concern was interlocks between railroads and banks and large industrial concerns, we read Section 10 as broadly as it is written, since the potential for abuse arises from the nature of the relationship between the firms, and not from the kinds of companies involved. Congress has limited the potential scope of anti-interlock prohibitions here to situations where at least one party is a common carrier; we will not limit it further.

■ B & O puts great stress on the fact that at the same time the House Judiciary Committee was considering the predecessor of Section 10, the House Committee on Interstate and Foreign Commerce had before it the specific problem of railroad interlocks.[3] In 1914 Section 10 emerged from the Judiciary Committee. But the Commerce Committee deliberated on its problem for six years more, until 1920, and then produced what became Section 20a of the Interstate Commerce Act, which requires prior ICC approval of any common directors or officers of railroads. 49 U.S.C. § 20a (1964). B & O would have us read these events as evidencing a Congressional determination to exclude

sub silentio interlocked railroads from Section 10, on the theory that by enacting Section 20a Congress must have felt that Section 10 did not deal with the problem.

Finally, B & O argues that the statute was intended to apply only to "vertical" interlocks (i. e., between railroads and their suppliers, or purchasers of their securities), not to "horizontal" interlocks between railroads. This construction must be rejected for reasons similar to those just given: although the vertical situation may have been the prime evil before Congress, the statute on its face reaches both relationships and the danger is as great in either.[4]

To recapitulate, we hold the transaction here was a "dealing in securities" within the prohibition of Section 10. Further, the section reaches transactions between railroads, despite the fact that they are in a horizonal relationship and that the relationship is also governed by Section 20a of the Interstate Commerce Act.

## II.

In April 1963 the two railroads had three common directors and, as seen above, the transaction fell squarely within the prohibition of the statute. B & O, however, argues that the statute's civil liability reaches only to the violating carrier, its officers and directors, and any party that interferes with the competitive bidding process, not to the interlocked corporation. As Reading initiated the transaction and there was no proof of any interference by B & O, B & O claims that it has no liability under the statute.

■ The civil liability here alleged is governed by Section 4 of the Clayton

---

3. See H.R.Rep. No. 681, 63d Cong., 2d Sess. 3 (1914).

4. B&O calls our attention to two staff reports which advance the horizontal-vertical distinction. See FTC, Report on Interlocking Directorates 11 (1951); Staff of Subcomm., No. 5, of the House Comm. on the Judiciary, 89th Cong., 1st Sess., Interlocks in Corporate Management 10 (Comm.Print 1965). We do not feel that such staff commentaries are to be taken as definitive interpretations, as they were not given in the context of rule making or adjudicatory procedures.

Act which provides that any person injured "by means of anything forbidden in the antitrust laws" is entitled to treble damages against the malefactor. 15 U.S.C. § 15 (1964). The proper inquiry, therefore, is whether Section 10 imposes a duty upon any interlocked corporation dealing with a common carrier not to deal with that carrier except through competitive bidding. We find it does and that civil liability is imposed on one in B & O's position.

Of the section's four paragraphs, the second and fourth impose criminal liability: the second paragraph for anyone interfering with competitive bidding, the fourth on any common carrier (and its officers and directors) that violates the statute. The third paragraph merely directs the carrier to report all transactions with an interlock to the Interstate Commerce Commission, which in turn is to investigate possible violations and transmit its findings to the Attorney General. The first paragraph, quoted above, defines the prohibition, but prescribes no penalties.

B & O would have us read civil liability as coextensive with the criminal proscription, and it gains some support for this argument from the fact that as written, the first paragraph only talks to the common carrier; it does not explicitly impose any correlative duty on the other party to the transaction. But we think that the statute does impose such a duty, and that civil liability, if it is to be effective as a deterrent, must reach both parties to the transaction.

In discussing the bill, witnesses and Congressmen repeatedly pictured the principal villain in an interlock as the other corporation, with the common carrier being bested in the transaction.[5] In Minneapolis & S. L. Ry. v. United States, 361 U.S. 173, 80 S.Ct. 229, 4 L.Ed. 2d 223 (1959), the Supreme Court succinctly posed the dangers:

> The evident purpose of § 10 of the Clayton Act was to prohibit a corporation from abusing a carrier by palming off upon it securities, supplies and other articles without competitive bidding and at excessive prices through overreaching by, or other misfeasance of, common directors, to the financial injury of the carrier and the consequent impairment of its ability to serve the public interest.

*Id.* at 190, 80 S.Ct. at 240. Although the Court's example is of the other corporation abusing the carrier by selling too dear, certainly buying something too cheaply is also within the purview of the section. It would be anomalous if the statutory duty were to be imposed only on the weaker party to the deal. Thus, we hold that by participating in the transaction B & O has violated a duty imposed by Section 10 and so is potentially liable.

### III.

B & O next argues that assuming it has violated a duty imposed by the statute, it still is not liable to Reading because plaintiffs have failed to show that any injury has been suffered by Reading as a result of what B & O has failed to do, participate in competitive bidding. B & O argues that there was no proof whatsoever that a request for competitive bids, as required by Section 10, would have elicited any responses. On the contrary, it points to convincing evidence that no one other than B & O would have been in any way interested in Reading's interest. Further, it argues that uncontradicted evidence in the record proves that the fair market value of the property to a hypothetical bidder was considerably less than the price that B & O actually paid.

The court below computed the fair market value on the basis of what Reading's interest would be worth to B & O, but we agree with B & O that in an action for damages under Section 10, the relevant inquiry into the value of the interest sold must be what price

---

5. See e. g., Hearings of House Comm. on the Judiciary, *supra*, at 679–80.

would have been reached by competitive bidding. For if the statutory procedure had been complied with, we must assume that B & O would have only paid just enough to top the highest bid, not what the interest was worth to it. And it is clear from this record that if there would have been any bidders under the Section 10 procedure, to them Reading's interest would have far less value than it had to B & O.

No railroad would have bid, as the Pennsylvania, the only other long haul line in Philadelphia, had its own terminal in the area. And any potential non-railroad bidder would surely have been dissuaded by the contractual and statutory restrictions which made use of the land for anything but railroad purposes exceedingly difficult. A hypothetical, potential bidder would have known that the operating agreement between Reading, B & O, and Terminal could only be terminated on a year's notice, and more important, that termination of a terminal railroad operation required ICC approval. 49 U.S.C. §§ 1(18), 1(20), 5(2), 5(4) (1964); ICC v. Memphis Union Station Co., 360 F.2d 44 (6th Cir.), cert. denied, 385 U.S. 830, 87 S.Ct. 66, 17 L. Ed.2d 66 (1966). Certainly, in this day and age a railroad desiring to maintain operations would be better received by the ICC than a non-railroad half-owner who petitions for permission to abandon operations in favor of a property development scheme.

Thus, B & O, if it were so minded, could create formidable difficulties for a third party purchaser who wanted to put the Terminal property to other uses. And a half-interest in the terminal operation in and of itself had virtually no value, since under the binding operating agreements Terminal earned virtually nothing. Judge Tyler suggested that a third party might be tempted to purchase the Reading interest to gain "at least negative control over operations of [Terminal]." 302 F.Supp. 818, at 826. But this is much too speculative a basis for implying the existence of a competitive bidder. We think it much more likely that no one would have wanted to buy into such a situation. At most he would only have considered taking the interest if it could be had at a substantial discount from its appraised value as unrestricted land.

As mentioned above, B & O, even if it paid Reading less for the interest than it was worth to itself, would only be liable under Section 10 if it paid less than would have been offered by a potential buyer through competitive bidding. So we must compare what a hypothetical bidder would have offered with what Judge Tyler found B & O actually paid. As a preliminary matter, however, we must examine Judge Tyler's computation of the value of the consideration B & O gave Reading.

Of the $1,125,250 that B & O agreed to pay Reading $225,250 was paid in cash upon execution of the agreement, and B & O was to pay the balance of $900,000 over a period of 5 years, with interest at 3%. But in April 1964, B & O anticipated these payments by prepaying the entire remaining balance: it paid the installment due of $180,000 and 3% interest ($27,000), and the remaining $720,000 less a prepayment discount of 5%. When added to the $225,250 paid at closing, B & O paid a total of $1,119,558.44.

Plaintiffs, however, claim that the value of the consideration should be appraised at the time of execution, and that what Reading received was worth considerably less than the nominal sales price of $1,125,250. In support of this contention, an expert witness testified that in his opinion the market value at closing, on April 30, 1963, of B & O's unsecured obligation for $900,000 was between $630,000 and $675,000. On the basis of this testimony and supporting evidence that in 1963 similar unsecured obligations of B & O were selling for about 70 to 75% of par, Judge Tyler accepted this valuation and concluded that Reading actually received consideration worth $885,250 for its interest— $225,250 cash at closing and notes worth no more than $660,000.

We cannot accept this approach. It is elementary that in computing damages the court must look to the actual extent of the injury, and not to how much hurt plaintiff might have suffered. If Reading had sold B & O's notes on the day after closing at a discount reflecting the value placed on B & O's unsecured obligations by the plaintiff's expert witness, the net worth of the value received would have been, as Judge Tyler found, around $885,000. But this did not happen. Payment in full was received a year after the closing, so that all Reading lost was the use of $900,000 for a year and the 5% prepayment discount, less the 3% in interest paid by B & O. Thus, we disagree with Judge Tyler's conclusion that the value of what Reading received is to be computed as of the day of closing; rather, we hold that the consideration is what is actually and ultimately paid after adjustment is made for loss of use of the money in the interim.

Accordingly, the computation must begin with the fact that Reading was denied the use of $900,000 for one year. Accepting as a reasonable rate of return the 5% rate used by the parties in computing B & O's prepayment discount, Reading if it had been paid in full at closing would have earned $45,000 on the $900,000 by April 30, 1964. As it received $27,000 from B & O as the first year's interest, it lost $18,000 in income. To this must be added B & O's 5% prepayment discount on the balance of $720,-000, or about $36,000, an item that would not have been incurred if payment in cash had been received initially. Netting these figures, we conclude that B & O's method of payment was worth approximately $54,000 less to Reading than would have been full payment at closing.

Stated another way, B & O actually paid Reading a total of about $1,119,560 consisting—in rounded figures—of the $225,250 down payment, the first installment of $180,000, the year's interest of $27,000, and the $720,000 principal balance less a 5% prepayment discount of $36,000. The down payment of $225,-250 plus the discounted value of $894,-310 ($1,119,560, the total payments received, minus the $225,250 cash down payment) is the actual value to Reading of the consideration paid by B & O. At the 3% rate of interest these notes bore, which was calculated to produce a return approximately equal to the historic return to Reading on its interest in Terminal, the discounted value of the deferred sum is about $868,500, or a total adjusted value of $1,093,500. A more accurate rate is the 5% standard which was the value of the prepayment discount; we think this is a more realistic appraisal of the return Reading could have earned on the funds, since as used by the parties it presumably represents a market rate rather than a coupon tied to the earnings of an unprofitable terminal operation. Using the 5% rate, the present value of the deferred payment was about $852,000, or a total present value of $1,077,000.

We turn now to the question of whether it can be said that a reasonable, hypothetical bidder would have offered Reading this much for the interest. We conclude the answer is no, and it follows that there has been no showing that Reading has suffered any damage as a result of B & O's violation of the statute in failing to solicit competitive bids.

In light of the severe restrictions on use of the terminal property, a third-party buyer would have offered considerably less than the land was worth to B & O. When negotiations with B & O were begun, Reading engaged the services of Greenfield and Company, a leading real estate firm in Philadelphia, to appraise Terminal's land and improvements. At trial, B & O called Meltzer, a vice-president of Greenfield, who had conducted the valuation. After explaining his valuation of $2,100,000, he was asked what in his opinion a third-party, hypothetical bidder would have paid for a half-interest in these items. He gave as his estimate a $600,000 figure, and to us

this uncontradicted testimony seems well within the range of possibility, as a discount of approximately 40% can reasonably be assigned the formidable burdens on the free and best use of the land.

Reading and B & O reached the price of $1,125,250 for the half-interest as follows:

| Item | Actual Transaction |
|---|---|
| Land under option to B&O at $.57 per square foot | $ 348,298 |
| Other land, appraised value of $1.00 per square foot | 885,171 |
| Buildings at appraised value | 600,500 |
| Tracks at book value | 164,959 |
| Quaker City Cold Storage Co. Mortgage | 295,818 |
| Total Assets | $2,294,746 |
| ½ Total Assets (Reading) | 1,147,373 |
| Less: ½ Wear and tear on tracks | 22,323 |
| ½ Interest (rounded off) | 1,125,050 |

As seen above the value received by Reading was less:

| Adjusted value of consideration received by Reading | |
|---|---|
| at 3% | $1,093,500 |
| at 5% | $1,077,000 |

We then consider what price a hypothetical bidder would have offered. In making this calculation, we assume, first, that he would have paid Reading for certain receivables at the value found by Judge Tyler; B & O and Reading assigned no value to this item in their negotiations. Second, we assume that the third-party would have offered $600,000 for a half-interest in the land and improvements and, third, that the hypothetical bidder would have paid the full purchase price in cash. On these assumptions, we conclude that no hypothetical bidder would have offered as much as $1,012,000, considerably less than what we find B & O actually paid:

| Item | Hypothetical Bid |
|---|---|
| Land under option to B&O | |
| Other land | $1,200,000 |
| Buildings and improvements | |
| Tracks at depreciated value | 120,213 |
| Quaker City Cold Storage Co. Mortgage | 295,818 |
| Receivables from B&O to Reading | 676,355 |
| Total Assets | $2,292,386 |
| ½ Total Assets (Reading) | 1,146,193 |
| Less: Receivables from Reading | 134,566 |
| Adjusted ½ Interest | $1,011,627 |

Thus, we find that B & O actually paid approximately $50,000 to $80,000 more than it can reasonably be expected would have been offered by any purchaser solicited through competitive bidding.[6]

Plaintiffs argue, however, that Section 10 reflects a Congressional determination that competitive bidding would assure a fair price, and that whenever a price less than fair is paid the failure to solicit competitive bids presumptively has caused the injury. But we do not read Section 10 to go so far. It is

---

6. Judge Tyler based his untrebled damage award of $544,000 on a computation of the value of the half-interest to B&O. He found three areas of underpayment, the first of which, the actual value of the consideration received by Reading, is discussed above. He also found that certain receivables owed to Terminal must be considered part of Reading's half-interest. Although we have given plaintiffs the benefit of the doubt and included this item in our calculation of how much a hypothetical bidder would have offered, we express no opinion on the correctness of Judge Tyler's finding. Also, we have grave doubts about his reevaluation of the terminal land not under option, from the $1.00 per square foot set by the appraiser to $1.25, but in light of our disposition we do not reach this question.

silent on civil liabilities, and Section 4, upon which this action is based, has always been construed to require some proof of a causal connection. See, e. g., Gottesman v. General Motors Corp., 414 F.2d 956, 961 (2d Cir. 1969). Though private actions under the antitrust laws are to be encouraged as a strong deterrent to misconduct, see Perma Life Muffers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L. Ed.2d 982 (1968), we refuse to approve a rule which would impose liability without any proof that the violation caused the injury, especially when there is substantial evidence in the record indicating the contrary.

▇▇▇▇ Plaintiffs argue that it is too much to ask them to prove, first, the existence of potential bidders, and second, that a hypothetical buyer would have offered more than was actually paid, as it is defendant's wrongdoing that created the difficulties of proof. Although the cases plaintiffs cite in support of the proposition that defendants may not escape liability by subjecting plaintiffs to impossible burdens of proving injury, causation, and damages in fact are almost exclusively concerned with proof of damages, not causation, see e. g., Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1945), we think the principle enunciated therein is sound. It is elementary that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created. See Package Closure Corp. v. Sealright Co., 141 F.2d 972 (2d Cir. 1944). But we do not accept plaintiff's suggestion that the proper remedy is to dispense with proof of causation entirely. Rather, we think that the proper resolution is to require the wrongdoers to bear the burden of proof on the issue of causality. As we find that B & O has sustained the burden of persuading us that there would have been no bidders and that, if there had been, they would have offered less than B & O actually paid, we find it not liable to Reading.

Reversed and remanded, with instructions that the complaint be dismissed.

FRIENDLY, Circuit Judge (concurring):

I thoroughly agree that the complaint should have been dismissed. But I reach that conclusion on bases more simple and direct than those of my brother LUMBARD.

While it may be that the transaction here can be brought within the strict letter of § 10 of the Clayton Act, 15 U.S.C. § 20, rigid adherence to that way of reading a statute was condemned four centuries ago in the wise observation, "Sometimes the Sense is more confined and contracted than the Letter, and sometimes it is more large and extensive." Eyston v. Studd, 2 Plowden 459, 465 (1573). This case is of the former sort. I should have thought the time long since past when a merely literal approach would be taken by a court whose most illustrious member wrote, in a famous passage: "[t]here is no surer way to misread any document than to read it literally," Guiseppi v. Walling, 144 F.2d 608, 624 (2 Cir. 1944) (L. Hand, J., concurring), aff'd sub nom., Gemsco, Inc. v. Walling, 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921 (1945).

Section 10 of the Clayton Act was a narrowly drawn statute designed to meet a particular set of experienced evils. It was addressed, not to citizens at large, but to a small class who knew its history, railroads and people dealing with them, and should be read accordingly. If the United States Code Annotated can be relied upon, it has been the subject of judicial construction on only six prior occasions in the 56 years it has been on the statute book. I doubt there is a railroad lawyer in the country, including those in the employ of the Interstate Commerce Commission, who would have thought § 10 applied to the winding up of a jointly owned terminal or other joint facility simply because the interest

of an affiliated selling railroad took the form of "securities" of a company organized for the purpose and having no dealings with the outside world, rather than an undivided interest in the land and improvements. Over the past half century there must have been scores of transactions between affiliated railroads like this one, but if competitive bidding has ever been used, plaintiffs have not brought it to our attention. A court should not apply a prohibitory statute in a manner that would make it a trap for persons who have been dealing in good faith.

The limited objective of § 10 emerges clearly from its legislative history. A leading proponent of the bill was Louis D. Brandeis, who had obtained a liberal education on the dangers of transactions between railroads and other companies having a common director as a result of his service as special counsel to the Interstate Commerce Commission in The Five Per Cent Case, 31 I.C.C. 351 (1914).[1] In testimony before the House Judiciary Committee he spoke of the evils of a railroad's borrowing at excessive interest rates from a commercial bank or issuing securities at too low a price to an investment bank that had a director on the railroad's board, and also of its buying equipment from a supplier with such a common director.[2] The bill

as passed by the House prohibited any person who was engaged as an individual, a partner or director in the conduct of a bank or trust company from acting as a director, officer or employee of a common carrier "for which he or such partnership or bank or trust company acts, either separately or in connection with others, as agent for or underwriter of the sale or disposal by such common carrier of issues or parts of issues of its securities, or from which he or such partnership or bank or trust company purchases, either separately or in connection with others, issues or parts of issues of securities of such common carrier," H.R. Rep. 627, 63d Cong. 2d Sess., 3. The Senate Committee broadened the House bill to include transactions in supplies or other articles of commerce and narrowed it by substituting the competitive bidding requirement for an absolute prohibition, Sen.Rep. No. 698, 63d Cong. 2d Sess., 47–48, and the conference accepted the Senate version. But the objective remained the same. As stated by Senator Chilton, one of the Senate conferees, 51 Cong.Rec. 16002–03 (1914):

if a common carrier has bonds to sell, it can not sell them to a bank which has as its director or manager or purchasing officer anyone who at the same time occupies a trust capacity or is interested in another corporation with

1. The Commission's report had this to say concerning the problem, 31 I.C.C. at 413–14:
   We suggest that an investigation be made with a view to determining to what extent the cost of construction, or of acquiring properties or capital, or of operation, is being increased through the holding by directors, officers, or employees of interests in other concerns with which the carrier has dealings. The Commission has prepared a compilation from answers to our question on the subject which shows that a considerable proportion of the officers and directors of railroad companies have interests in such concerns, including locomotive works, car-manufacturing companies, steel and iron works, coal mines, wireworks, bridge companies, manufactories of railway appliances, oil companies, electric machinery companies, glass companies, cement companies, warehouse companies, surety companies, railway publishing houses, and trust companies. The answers of carriers to the Commission's questions on this subject are in many respects incomplete and unsatisfactory, but the compilation by the Commission will be of service in an inquiry into this important subject. Further investigation is being conducted independently by the Commission.

2. Hearings before the House Judiciary Committee, 63d Cong. 2d Sess., Trust Legislation, 1913–14, 679–80. With respect to purchase of cars, coal and locomotives from companies with a common director, see also In re Financial Transactions of the New York, N. H. & H. R. R., 31 I.C.C. 32, 61 (1914).

which the dealings may be had, unless the transaction is open and fair, and the common carrier, after competition, gets the best price for the bonds, and in case the transaction is a purchase by the common carrier, unless it gets the lowest price for the articles purchased.

Such scant judicial expression as there is supports the view that the "securities" provision is limited to sale of a carrier's own securities—the evil at which § 10 was aimed. In Minneapolis & St. L. Ry. v. United States, 361 U.S. 173, 190, 80 S.Ct. 229, 4 L.Ed.2d 223 (1959), the Court footnoted the passage quoted by Chief Judge Lumbard as follows:

"The legislative history of § 10 of the Clayton Act, though meager, supports the view stated in the text. *In fact, the language of the several drafts of § 10, together with the types of abuses cited in support of its enactment, suggests strongly that the words 'dealings in securities' were intended to cover only a carrier's dealings with related persons in its own securities,"* 361 U.S. 173 at 190 n. 13, 80 S.Ct. 240 (Emphasis supplied.)

See also Independent Iron Works, Inc. v. United States Steel Corp., 322 F.2d 656, 668–669 fn. 16 (9 Cir.), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963). Although, as at present advised, I would subscribe to that reading, we are not required to decide that issue here. We need hold only that Congress did not mean to require competitive bidding in the case of "securities" which represent a share in a joint venture with an affiliated railroad and by their very nature could not be expected to elicit a substantial competitive bid. Congress meant to require competitive bidding when that would serve a useful purpose, not to demand a mere formality. The complaint should therefore have been dismissed on the defendant's motion for summary judgment.

If I were to reach the question of proof of injury, I would hold that plaintiffs completely failed to establish this, without having to engage in the close computations made by the Chief Judge. After having persuaded the district court that the transaction came within the statute as being a sale of securities of the Terminal Company, plaintiffs dextrously shifted ground on the issues of injury and damages and treated the Reading's interest as if it were in the underlying assets. The Chief Judge's computations likewise proceed on that basis. But there was no evidence that anyone would have made a substantial competitive bid for the *securities,* as one sentence of the opinion recognizes. Meltzer's $2,100,000 valuation was for the land and buildings as a whole, and his testimony that a hypothetical bidder would have offered $600,000 for a half interest in the land reflected only the discount, estimated at 20%, which the market would make for lack of control in the usual situation where the owners have a common interest in maximum realization in the land as such but might have normal disagreements on how to achieve it. That was not at all the situation here, where the B & O's interest lay in its continued use of the property as a produce terminal. A purchaser wishing to realize on the underlying assets would first have had to persuade an equity court to appoint a receiver to resolve the different objectives of the two owners in the purchaser's favor, and then to have the receiver induce the Interstate Commerce Commission to sanction an abandonment over the opposition of the B & O and, almost certainly, of users of the Terminal and city and state authorities. I should not suppose the prospects of success in either endeavor would have been bright. More important, anyone would have been out of his mind to offer the Reading $1,440,000 under these circumstances in the hope of obtaining exactly that amount at the end of this tortuous, uncertain and costly road. This is especially clear when it is realized that this sum comes from the judge's having raised the value of the Reading's half interest in the land more

than $100,000 over the figure reached by the Reading's own expert, who had devoted his life to Philadelphia real estate, without any regard to the discount the expert thought appropriate for sale of a half interest, and having included $272,000 of "receivables" from the B & O which that company disputes on substantial grounds and, at very best, could not have been collected without further litigation. There was equally little chance of such a bid from a person who would be attracted by the prospect of ultimately collecting a rental representing a fair return upon that figure, from a railroad whose bonds were selling at discounts at 25% to 30%—a theory suggested by plaintiffs' counsel at oral argument in an effort to overcome the considerations just mentioned but entirely without record support. People had better things to do with their money in 1963, or at least thought they had. The B & O would have had no reason to be concerned about the possibility of bidders so irrational as this. Speculations by a trial judge which defy business sense cannot be made impregnable by calling them "findings of fact."

In light of all this it is entirely natural that, as an officer of the Reading testified, "it simply would not have occurred to me as a railroad man that you could sell it [Reading's interest in the Produce Terminal] to anybody else other than this partner in the joint facility." The Reading received a good deal more for its "securities" in the Terminal than it ever could have obtained on competitive bidding. The B & O deserved to be commended for its fairness in bailing out it hard-pressed affiliate at the very price requested; it should not have had the burden of defending against a complaint whose ingenuity considerably outran its merit.

HAYS, Circuit Judge (dissenting):

I agree with Chief Judge Lumbard's conclusion that B & O violated a duty imposed upon it by Section 10 when it purchased Reading's interest in the terminal land and facilities without competitive bidding. In addition, however, I would hold that Reading was damaged in that it received less than the fair market value for its interest. Nevertheless since I believe that the trial court underestimated the value of the consideration received by Reading, I would remand for recomputation of damages.

As Chief Judge Lumbard points out, Section 10 was enacted to insure that common carriers would be treated fairly in the purchase and sale of goods and securities where the purchaser and seller had interlocking directorates.[1] The

---

1. The impetus for Section Ten came from President Wilson's message to Congress of January 20, 1914 in which he said:

"We are all agreed that 'private monopoly is indefensible and intolerable,' and our program is founded upon that conviction. It will be a comprehensive but not a radical or unacceptable program, and these are its items, the changes which opinion deliberately sanctions and for which business waits:

"It waits with acquiescence, in the first place, for laws which will effectually prohibit and prevent such interlockings of the *personnel* of the directorates of great corporations—banks and railroads, industrial, commercial, and public-service bodies—as in effect result in making those who borrow and those who lend practically one and the same, those who sell and those who buy but the same persons trading with one another under different names and in different combinations, and those who affect to compete in fact, partners and masters of some whole field of business. Sufficient time should be allowed, of course, in which to effect these changes of organization without inconvenience or confusion.

"Such a prohibition will work much more than a mere negative good by correcting the serious evils which have arisen because, for example, the men who have been the directing spirits of the great investment banks have usurped the place which belongs to independent industrial management working in its own behoof. It will bring new men, new energies, a new spirit of initiative, new blood, into the management of our great business enterprises. It will open the field of industrial development and origination to scores of men who have

House version of the Bill proposed to cure the vice of insider leverage by prohibiting direct dealing between a common carrier and a corporation with interlocking directorates.[2] The Senate felt that this provision was too harsh and replaced it with a requirement of competitive bidding. The relevant Senate Report states in pertinent part:

"The prime object of this provision is to prevent common or interlocking directors in corporations which occupy the relations to each other which are thus described; and is mainly intended to arrest the practice of the same persons occupying conflicting and incompatible relations in the corporate dealings of common carriers, often being practically both seller and purchaser, lessor and lessee and trustee and beneficiary of the trust. While this evil is fully appreciated, the committee nevertheless recognize that, especially in the case of railroads, emergencies may arise when absolutely prohibitory law against such dealings would be most injurious to the public. In the case of railroads calamities of fire and flood might make it necessary in the shortest possible time and to a certain extent regardless of lesser consequences to replace engines, cars and bridges. The Committee have, therefore, recommended a substitute for the House paragraph on this subject, which, with the publicity, competitive bidding and the supervision of the Interstate Commerce Commission provided for, will, it is believed, minimize if not wholly cure the evil to be reached."

S.Rep.N. 698, 63d Cong. 2d Sess., pp. 47–78.

The device of competitive bidding has had a long history of use by public, quasi-public and private enterprises. The theory supporting the requirement of competitive bidding, of course, that it will tend to assure that the seller will receive the fair value of the property that is to be sold. The procedures specified under Section 10 are designed to provide this protection. The I.C.C. regulations [3] require extensive publicity, uniform specifications, review by the Commission of the bidding procedure and award, and preservation of relevant documents.

In light of the reasons for requiring competitive bidding and the evils which Congress intended to control by enacting Section 10, the absence of competitive bidding is per se injurious. In a situation like that presented here where the issues of proof are difficult and the lines between seller and purchaser are not clearly drawn there is a distinct possibility of overreaching and competitive bidding is particularly important.

The trial court found that:

"[I]f it be assumed that competitive bids were sought in this sale, almost certainly B&O would have been concerned to submit a sufficiently high bid so as to maintain its control of Terminal. Conversely, a third party may well have been tempted to submit a sufficiently high bid in order to become a joint owner of the property with B&O, exercising at least negative control over operations of the company. In short, it is too easy to conceive of a number of bidding possibilities which almost certainly would require a bid figure equal at least to one-half

been obliged to serve when their abilities entitled them to direct. It will immensely hearten the young men coming on and will greatly enrich the business activities of the whole country."
51 Cong.R.1963 (1914). See United States v. Boston & Maine R. Co., 380

U.S. 157, 160–161, 85 S.Ct. 868, 13 L.Ed. 2d 728 (1965).

2. See S.Dock. No. 584, 63d Cong., 2d Sess., p. 10.

3. 49 C.F.R. § 1010 (1970).

of the fair market value of Terminal's assets."

Klinger v. Rose, 302 F.Supp. 818, 826 (S.D.N.Y. 1969). These findings were certainly not clearly erroneous.[4]

The cases which hold that defendants may not escape liability by subjecting plaintiffs to impossible burdens of proof of damages are directly applicable. See, e. g., Zenith Radio Corp. v. Hazeltine Research Inc., 395 U.S. 100, 123–125, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); Bigelow v. RKO Radio Pictures Inc., 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946); Story Parchment Co. v. Patterson Parchment Paper Co., 282 U.S. 555, 562–566, 51 S.Ct. 248, 75 L.Ed. 544 (1931); Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 378–379, 47 S.Ct. 400, 71 L.Ed. 684 (1927). Precise proof of damages is not required where there is "a just and reasonable estimate of the damage based on relevant data" Bigelow v. RKO Radio Corp., *supra*, 327 U.S. at 264, 66 S.Ct. at 580. One-half the fair market value of the property was a reasonable basis for valuation of Reading's interest.

I agree with Chief Judge Lumbard that it was error for the trial court to appraise the consideration passing from B & O to Reading as of the time the transaction was executed and to ignore B & O's subsequent payment in full a year after the closing. I would, therefore, remand for recomputation of damages.

---

4. "In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo*. The authority of an appellate court, when reviewing the findings of a judge as well as those of a jury, is circumscribed by the deference it must give to decisions of the trier of the fact, who is usually in a superior position to appraise and weigh the evidence. The question for the appellate court under Rule 52(a) is not whether it would have made the findings the trial court did, but whether 'on the entire evidence [it] is left with the definite and firm conviction that a mistake has been committed.' United States v. United States Gypsum Co., 333 U.S. 364, 395 [68 S.Ct. 525, 542, 92 L. Ed. 746] (1948). See also United States v. National Assn. of Real Estate Boards, 339 U.S. 485, 495–496 [70 S.Ct. 711, 717, 94 L.Ed. 1007] (1950); Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 289–291 [80 S.Ct. 1190, 1198–1199, 4 L.Ed.2d 1218] (1960)." Zenith Radio Corp. v. Hazeltine Research Inc., 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969).