COLUMBIA PICTURES INDUSTRIES,
INC., et al., Plaintiffs-Appellants,

v.

AMERICAN BROADCASTING COM-
PANIES, INC., et al., Defendants-
Appellees,
and
Columbia Broadcasting System, Inc.,
et al., Defendants.

No. 922, Docket 74–1172.

United States Court of Appeals,
Second Circuit.

Argued March 8, 1974.

Decided July 3, 1974.

Whitney North Seymour, New York City (Simpson Thacher & Bartlett, New York City), for plaintiffs-appellants.

Louis Nizer, New York City (Phillips, Nizer, Benjamin, Krim & Ballon, New

York City), for plaintiff-appellant United Artists.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for plaintiff-appellant Warner Bros.

Herbert A. Bergson, Washington, D. C. (Bergson, Borkland, Margolis & Adler, Washington, D. C.), for defendants-appellees American Broadcasting Companies, Inc. and others.

Hawkins, Delafield & Wood, New York City, for defendants-appellees American Broadcasting Companies, Inc., and others.

Cravath, Swaine & Moore, New York City (Bruce Bromley, Robert S. Rifkind, Robert F. Mullen, Paul C. Saunders, and Steven M. Edwards, New York City), for defendant Columbia Broadcasting System, Inc., as amicus curiae.

Seward & Kissel, New York City, for defendant CBS, Inc.

Hughes, Hubbard & Reed, New York City, for defendant Viacom International, Inc.

Before LUMBARD, MOORE and OAKES, Circuit Judges.

MOORE, Circuit Judge:

Plaintiffs-appellants [1] appeal from an order of Judge Palmieri denying their motion for a preliminary injunction which sought temporarily to enjoin "the defendant American Broadcasting Companies, Inc. ('ABC'), during the pendency of this case, from exhibiting or offering on the ABC television network any theatrical feature film produced or financed in whole or part or acquired on negative pick-up by ABC or a subsidiary of it . . . ."

The complaint in this action was filed on September 28, 1970, and in substance alleges a violation by defendants of federal antitrust laws (Sherman Act, 15 U. S.C. §§ 1-3). Appellees interposed an answer, defenses and counterclaims. Under date of July 3, 1973, plaintiffs by motion sought the preliminary injunction. During this almost three-year period, extensive discovery has taken place and on at least one occasion appellants sought the aid of the court to restrain defendants from exhibiting their films.[2] The long period of "big case" preparation appears to be drawing to a close because even as of July 3, 1973, discovery was proceeding "apace" and could "be expected to be expeditiously completed." (A120.)

Voluminous affidavits have been submitted in support of, and in opposition to, the motion. In addition, letters, documents, interdepartmental correspondence, financial statements, etc., form part of the record consisting of some 999 pages before Judge Palmieri. One of the affidavits supporting the motion alleged that ABC "has advised us [presumably the plaintiffs] of its plans to show four of its own films on its own television network in the forthcoming television season [1973–74] and indicates that more will follow." The four films are "Lovers and Other Strangers,"[3] "For Love of Ivy," "Charly" and "Krakatoa/East of Java."[4]

1. Plaintiffs/appellants are a number of major independent film producers and distributors, from whom ABC has purchased prime-time programming amounting in 1969–73 to some $288.9 million, or over 50 per cent of its total dollar expenditures for such programming. CBS is a codefendant but participated in this appeal only as amicus curiae since, because it had not indicated any intent to exhibit on its network telecasts any films it had made, it was not sought to be enjoined.

2. "Whatever Happened to Aunt Alice" was scheduled for showing on October 29, 1972, and shown despite appellants' objection and Judge Palmieri's warning ABC that it was proceeding at its peril.

3. "Lovers and Other Strangers" was shown after the preliminary injunction was denied. Another panel of this court refused to stay that showing scheduled for the evening of February 11, 1974, the day the stay argument was heard, but did stay the showing of the other three films pending this appeal.

4. ABC has a library of 39 theatrical feature films which it has produced. CBS's library is 34.

Against the background of a highly concentrated industry,[5] appellants' underlying assertion is that ABC, by exhibiting its own-produced films over its own network is violating the federal antitrust laws by "self-dealing."[6] The exhibition by ABC of its own films it is argued, eliminates its need to buy appellants' films, thus depriving appellants of a principal market for feature films. They also inject a "public interest" argument which, viewed in one light, is as much to say that they believe the public has more of a right to view their films than those of ABC; in any event, the public's interest in " 'the widest possible dissemination from diverse and antagonistic sources,' " Mt. Mansfield Television, Inc. v. FCC, 442 F.2d 470, 478 (2d Cir. 1971), *quoting* Associated Press v. United States, 326 U.S. 1, 20, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945), is, we do not have to be reminded, of the greatest importance. *Cf.* Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

Despite appellants' expressed fears that over the years ahead ABC may

show a large number of self-produced films, although apparently with 39 it has stopped production, at this time and for purposes of this decision we will consider only the four films which ABC has indicated it would show during the 1973–74 season. To be sure, both parties have argued the case otherwise— ABC as if it were now free to show any of its feature films, appellants as if ABC were about to show them all. It is also true that the district court's denial of the temporary injunction is not by its terms limited to those four films. The injunction was sought, however, only when ABC scheduled those four. The district court opinion appears to us premised on the proposition that only those four are sought to be shown before the case proceeds to trial on the merits.[7] It refers to "the four feature films in question."[8] Its discussion of irreparable harm is based upon the exhibition of only these four films.[9] Thus, while for strategic reasons ABC would like to treat the denial of a temporary injunction as a carte blanche, and appellants apparently for similar reasons would

5. Mt. Mansfield Television, Inc. v. FCC, 442 F.2d 470 (2d Cir. 1971), upheld the FCC's "prime time access," "financial interest" and "syndication" rules, 47 C.F.R. §§ 73.658(j) & (k), seeking to "provide opportunity—now lacking in television—for the competitive development of alternate sources of television programs . . . ." *Id.* at 479 n. 29. Appellants argue here that ABC's power as a network will enable it to use its theatrical feature films as leverage as well as to support their products, thus resulting in illegal restraints of trade and monopolization.

6. The United States on April 14, 1972, sued all three national television networks in the Central District of California, Civil Nos. 72–819, –820, –821. NBC does not produce feature films or television programming. Both ABC and CBS own licenses to operate key television stations in five of the larger local markets.

7. The urgency asserted by plaintiffs as a ground for injunctive relief is based upon ABC's announced intention to exhibit four of these films on its television network before this case can proceed to trial and specifically in January and February of 1974.

8. Contrary to the contentions of plaintiffs, the Court is not persuaded that ABC, in proposing to exhibit the four feature films in question, has deliberately embarked upon a policy of selecting inferior programming to its own financial advantage and to the prejudice of plaintiffs.

9. Plaintiffs allege that they will be irreparably injured if ABC is not enjoined from executing its plan to exhibit four motion pictures that it has produced.

. . . However, it appears from the papers that the injury feared by plaintiffs is represented only in small part by the four films which ABC proposes to exhibit.

Plaintiffs argue that if ABC is permitted to exhibit the four pictures in question the floodgates will be cast open and ABC may be expected to escalate the exhibition of its own films to the full extent that such films are available to it.

Plaintiffs also argue that the result of allowing ABC to proceed with its plan to show these four movies will be to effectively preempt the possibility of adequate relief in the future.

like to have us treat the case here and now on the merits, we see no reason to do so. The trial may be under way by the autumn of 1974 and, if not, the trial judge will be available to consider such further relief as may be warranted.[10] Thus our affirmance of the denial of preliminary relief by the district court is only to the extent of permitting the other three films to be shown, though by virtue of the date of entry of this decision it is immaterial to us whether they are shown in the 1973–74 or the 1974–75 season.

The standard factors which this court now considers upon an application for a preliminary injunction are well known: (1) clear likelihood of success on the law and the facts then available and possible irreparable injury, or (2) sufficiently serious questions on the merits making them fair ground for litigation and a balance of the equities tipping decidedly in favor of preliminary relief. Sonesta International Hotels Corp. v. Wellington Associates, 483 F.2d 247, 250 (2d Cir. 1973); Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co., 476 F.2d 687, 692–693 (2d Cir. 1973). The district judge's careful opinion read as a whole demonstrates that he gave full consideration to all of the factors involved in the light of the facts available to him, and, while another judge might have arrived at a different result, we cannot say that this result constitutes an abuse of the wide discretion normally accorded a district court on the issue of preliminary relief. Stark v. New York Stock Exchange, 466 F.2d 743, 744 (2d Cir. 1972).

Here it is sufficient to say, without in any way indicating our views on the merits, that there are "substantial, serious, difficult and doubtful" questions so "as to make them a fair ground for litigation and thus for more deliberate investigation." Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2d Cir. 1953). As we have said, plaintiffs assert that ABC's entry into production of feature films and its exhibition on its own network, in light of ABC's own position in the television industry, would violate antitrust laws. ABC responds that its course of action was and is merely vertical integration by internal expansion which is not per se illegal and which could under certain circumstances be pro-competitive."[11] Legality, ABC argues, depends upon purpose or intent, as to which the trial court found that "(1) the defendants have apparently acted without any intent to injure the plaintiffs, [and] (2) they appear to have acted against the background of a product shortage and . . . rapidly escalating prices for the licensing of film product for television production." The trial court found, and we agree with it, that there are "vast and intricate problems of fact and law . . . which cannot be fairly resolved short of . . . a trial . . . ."

On this basis, it would be impossible for either party to make out a *clear* showing of probable success on the merits, thus eliminating the basis for a grant of a preliminary injunction under the more traditional test of clear showing of probable success plus a showing of irreparable injury. This finding, however, certainly satisfies the first prong of our more recently articulated test for injunctive relief—that prong being the presence of complex legal and factual issues.

10. We do not think that Judge Palmieri intended to let ABC show any film at all without restriction pending trial.

11. The circumstances here are a claimed "product shortage" resulting from prior utilization of the major producers' libraries coupled with the manufacture of fewer films by them (162 in 1966 as opposed to 333 in 1956) while the television consumption of films has been increasing (and is now about 150 per year). There is some indication in the discovery documents that the "majors" foresaw this as early as 1965 and at least by 1967. As with other shortages to which the public has become accustomed, prices have gone up; production costs have risen but there are indications that the average price per feature film license has increased from $100,000 in 1961 to $800,000 in 1967.

Appellants argue that the district court never actually "balanced the equities" after finding that appellants had met the first prong of the applicable test. We disagree. It appears to us that the district court, in balancing the "equities," first gave thorough consideration to the type of damage appellants claimed that they would suffer were preliminary injunctive relied to be denied. The district court concluded that appellants "failed to make a persuasive showing that they are in danger of immediate irreparable injury if this temporary relief is not granted." This conclusion was based on the following two findings:

1. "[T]he injury feared by plaintiffs is represented only in small part by the four films which ABC proposes to exhibit," and "The essence of plaintiffs' claim of injury at this point clearly is not the showing of four movies by ABC, but plaintiffs' prognostications as to subsequent practices by ABC . . .," "as to the basis of [which] predictions" plaintiffs have offered "no persuasive evidence."

2. Neither prospective difficulty in computing damages nor the fact that computations will be based on the effects of foreclosed competition necessarily preclude such computations; the damages alleged "are susceptible to monetary computation."

■ Appellants dispute each of these findings, as follows. They argue that for every feature film that is shown a valuable network spot is foreclosed, thereby not only making it harder to sell films to ABC for television licensing, but delaying the flow of revenues from the licenses already purchased from appellants by the network. But we are talking, as the district court was talking, about only four films; as to these ABC is on notice, concededly and from the district court's opinion, that it may be liable in treble damages. We refuse, as we say, to treat this case as if ABC

were showing a substantial number of films before the trial on the merits; it will be open to appellants to seek a temporary injunction anew if ABC goes beyond these four.[12] Moreover, all seven appellants operated more profitably than ABC in 1972. And, while damages may be difficult to compute, they are provable by inference from the acts and their tendency to injure, as well as from evidence of business, prices, profits and values, Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264–265, 66 S.Ct. 574, 90 L.Ed. 652 (1946), as to which on the issue of causality ABC if found liable would appear to have the burden of proof. Klinger v. Baltimore & Ohio Railroad Co., 432 F.2d 506, 516 (2d Cir. 1970).

■ Having thus found that there had been no showing by appellants of harm of either "great" or "irreparable" dimensions, the district court turned to consideration of other factors relevant to a balancing of the equities in this case. That court referred to three matters as follows:

1. The plaintiffs did not seek injunctive relief until almost three years after the litigation began;

2. Plaintiffs are to some extent *in pari delicto* as some of them have engaged in "block-booking," *i.e.*, requiring ABC to license feature films in groups which include low quality films;

3. Institution of litigation by the Justice Department against the networks together with continuous regulation by the FCC, takes the ground from under appellants' argument that they are the vindicators of the "public interest"; indeed, the public's interest is transcendent of and more complex than, not co-extensive with, the appellants' own interests.

The district court concluded that "the equitable considerations militate against" the grant of preliminary injunctive relief. We agree.

12. The challenged four films would occupy eight hours of prime time programming, less than ¼ of 1 per cent of the 3,276 hours of prime time available to the three networks

Apparently on oral argument for a stay pending appeal the trial judge qualified his finding of laches by saying "I don't charge you with laches but with the unhurried pursuit of the remedy," and appellants argue that they moved promptly on July 3, 1973, as soon as ABC announced its planned showing of the four films on April 6, 1973. In weighing the equities, however, it certainly was proper for the trial court to take into account that the action itself was not instituted until three years after appellants learned of ABC's making of films and that the motion for injunctive relief was not made until three years after the action was begun.

Appellant United Artists argues that it was not involved in block-booking, and all appellants claim that ABC plans to use films of its own of low quality.[13] But these are issues for trial and the trial court was certainly justified in considering that appellants were not as pure as Pauline in their peril. It is true that the *in pari delicto* doctrine is not a defense on the merits, Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 138–140, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), but the practice of block-booking certainly can be taken into account in determining the equities as a prelude to ruling on a preliminary injunction, at least where a clear showing of "public interest" has not been made out. *See* Heldman v. United States Lawn Tennis Association, 354 F.Supp. 1241, 1249 (S.D.N.Y. 1973).[14] Appellants assert that "The preservation of competition is the fundamental public interest underlying the antitrust laws." (Appellants' Brief at 34.) But here the question is whether it is in the public interest to condemn in advance of trial.

Appellants are fearful that ABC's alleged monopoly over the air waves will give ABC a monopoly over the ideas broadcast. Presumably appellants would by means of judicial assistance substitute their ideas for those of ABC. However, it is too premature (and scarcely feasible, if material) at this stage to determine whether ABC or plaintiffs gives the public better, "social, political, esthetic, moral, and other ideas and experiences . . . ." Red Lion Broadcasting Co. v. FCC, 395 U.S. at 390, 89 S.Ct. at 1807. As in many cases, one detects less concern with the public's interest than with appellants' financial interests.

Of no small importance in reviewing Judge Palmieri's denial of a preliminary injunction is the fact that under the individual calendar system he will be the judge who will preside over the trial. His present judgment as to issues of fact and law still unresolved should be entitled to the greatest consideration. In his opinion, "[T]he essence of plaintiffs' claim of injury at this point clearly is not the showing of four movies by ABC, but plaintiffs' prognostications as to *subsequent* practices by ABC, and CBS against whom plaintiffs do not seek a preliminary injunction." When, and if, these "subsequent" practices become threatened realities, application can be made for such relief as the circumstances may warrant. For the moment we are concerned only with the threatened showing of the four films previously mentioned. This threat Judge Palmieri has found to be insufficient to warrant the granting of a preliminary injunction. In our opinion his exercise of discretion in denying the motion and the order entered thereon should be af-

---

13. It gives one pause for thought to follow the suggestion of appellants that ABC rates its films on the basis of their anticipated "audience share" so that an "A" rating means a film that will command "audience shares" of 33 or better. We have been unable to fathom whether there are other criteria for film quality rating but this too will doubtless be a subject for further exploration at the trial.

14. The sale of films to television networks by block-booking has been held to violate the Sherman Act. *E. g.*, Fields Productions, Inc. v. United Artists Corp., 318 F.Supp. 87, 88 (S.D.N.Y. 1969), aff'd, 432 F.2d 1010 (2d Cir. 1970), cert. denied, 401 U.S. 949, 91 S. Ct. 932, 28 L.Ed.2d 232 (1971).

firmed, without prejudice to renewal in the event ABC plans any further showing of its own films before trial.

Affirmed.

LUMBARD, Circuit Judge (dissenting):

I dissent.

We have recently held that a preliminary injunction may be granted if a showing has been made (1) of sufficiently serious questions going to the merits to make them a fair ground for litigation and (2) a balance of hardships tipping decidedly toward the party requesting the preliminary relief. Gulf & Western Industries v. Great Atlantic & Pacific Tea Company, 476 F.2d 687, 692–693 (2d Cir. 1973); Sonesta International Hotels Corporation v. Wellington Associates, 483 F.2d 247 (2d Cir. 1973).

With regard to the first of these prerequisites, there can be little doubt that several substantial and highly complex issues involving antitrust law have been raised by the plaintiffs here. This view was shared by Judge Palmieri, who wrote in his opinion for the district court that:

> There are vast and intricate problems of fact and law inherent in the contentions advanced by the plaintiffs which cannot be fairly resolved short of a thorough examination of the facts, which only a trial proceeding can afford.

A further indication of the substantiality of these antitrust issues involving allegations of unreasonable restraints of trade and monopolization is the antitrust suit which the Justice Department has commenced against the three major networks in the Central District of California. This suit also challenges on antitrust grounds the networks' policy of televising programs produced by their own subsidaries.

Moreover, we are confronted here with unique and unsettled questions regarding how the antitrust laws are to be applied to the government-licensed, limited-frequency, entry-proof market of television in which the three networks have a virtual monopoly on the type and quality of programs and ideas that are disseminated to the public by television.

Indeed, ABC's interest actually reach far beyond television itself to encompass production of motion pictures [1] and ownership and operation of motion picture theatres.[2]

This court has previously recognized the monopoly position and the inclination of the networks to engage in predatory and restrictive trade practices. Mt. Mansfield Television, Inc. v. F.C.C., 442 F.2d 470 (2d Cir. 1971). This makes it all the more essential that the issues here raised be preserved for trial, where these questions will be given the full consideration they require.

As for the second prerequisite for a preliminary injunction, it, too, is satisfied by the record before us. Little, if any, damage would be suffered by ABC were it to be enjoined from showing its own films on its television network. Whatever the merit to the assertion by ABC that in 1967 there was a shortage of films which prompted it to enter film production, it seems clear that ABC presently has an adequate supply of motion pictures of varying quality to fulfill its programming needs for at least another year or two, if not longer. The trial should be concluded within that time, especially in light of Judge Palmieri's stated intention of expediting this litigation as much as possible. Under the circumstances, ABC would suffer no substantial harm by the granting of a preliminary injunction.

1. Since 1967, ABC has produced or financed 39 theatrical feature films. Recently, however, it ceased production.

2. Apparently, ABC's stake in motion picture theatres is considerable. While we are not advised as to the figures at the present time, the record shows that in 1967 ABC owned and operated the largest theatre circuit in the United States, on which distributors were dependent for between 10% and 11% of their annual turnover. At oral argument appellants' counsel stated that ABC owned some 400 theatres. His statement was not denied.

In contrast, the injury that might be suffered by some, if not all, of the appellants could be serious. An important factor to consider in this regard is ABC's concession at oral argument that if we affirm the decision below, ABC will feel free to show during the pendency of this litigation as many of its own productions as it deems desirable, even conceivably all of the thirty-nine films presently available.[3] This would deny the independent producers many millions of dollars in potential income. It could also have the additional adverse effect of postponing the exhibition of independently produced ABC-owned films, thereby denying the plaintiffs further income which they might otherwise have earned, as a substantial portion of the fees from these films are not paid until the pictures are actually shown.

Even if ABC was permitted to show only the three movies presently scheduled to be televised, which is the approach adopted by the majority, substantial potential revenues running into the millions of dollars would be lost by independent producers, since each theatrical film has an average network television value of approximately $700,000. The fact that the plaintiffs here face a multimillion dollar loss, while the defendant is in no way threatened with material injury, brings this case squarely within the "balance of hardships" test set forth in *Gulf & Western* and *Sonesta International Hotels* and supports the granting of the preliminary injunction sought by the plaintiffs.[4]

The argument made by the defendant that preliminary relief should, nevertheless, be denied because the plaintiffs can always recover damages later if they prevail ultimately on the merits in the district court *is not entitled to any weight.* As plaintiffs have pointed out,

it will be impossible to determine at that point which companies' films would have been purchased and thus which companies would be entitled to relief. While conceivably some solution to the damages problem could be worked out, any solution would be highly speculative and would be best avoided.

Although the hardships would weigh dramatically against the plaintiffs were we to deny the plaintiffs preliminary relief, defendant argues that the plaintiffs are barred by laches and unclean hands. This argument lacks merit. Plaintiffs have not been dilatory in seeking a preliminary injunction. While it is true that the plaintiffs did not initially seek injunctive relief when the ABC produced movie "Whatever Happened to Aunt Alice" was scheduled for viewing on October 29, 1972, as soon as ABC indicated on April 4, 1973 that it would be following a policy of televising on a regular basis films which it had produced, the plaintiffs forthwith sought relief. It was good judgment, and proper regard for the court's time, not to press forward for preliminary relief until it was entirely clear that ABC was about to show some of the films it had produced.

The claim of unclean hands, resting on the allegation of block-booking, should be given no weight. The claim has been vigorously denied by the plaintiffs and Judge Palmieri made no findings with regard to this disputed issue. But aside from the fact that there has been no finding that any of the plaintiffs employed block-booking, the thrust of the Supreme Court's decision in Perma Life Mufflers v. International Parts Corporation, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), if not its holding, was precisely "the inappropriateness of invoking broad common-law barriers to relief where a private suit serves important public purposes," 392

---

3. The defendant's frank concession supports plaintiffs' fears of a massive foreclosure by ABC and runs counter to Judge Palmieri's conclusion that these fears are based on "prognostications" backed by "no persuasive evidence."

4. Although CBS also has produced films for television, no preliminary injunction has been sought against it because it has yet to indicate any definite plans to televise these films on its own network. As for NBC, unlike the other two national networks, it does not produce theatrical feature films.

U.S. at 138, 88 S.Ct. at 1984, such as "the overriding public policy in favor of competition." 392 U.S. at 139, 88 S.Ct. at 1984. Since this is the very interest which plaintiffs assert to be at stake, the unclean hands defense should not influence our determination whether to grant relief.

Defendant's further argument that the preliminary relief sought here is equivalent to the ultimate relief sought is also without foundation. As was emphasized at oral argument by plaintiff's counsel, the permanent relief requested goes considerably further and includes fundamental restrictions on ABC's participation in the feature film industry as well as a prohibition against its producing, distributing, or having any interest in television entertainment programming.

In sum, I would reverse and grant the relief prayed for without expressing any views on the merits, for the reason that complex and important questions of law have been raised and the hardships which would result from a denial of the preliminary injunction would weigh far more heavily against the plaintiffs than a grant of the injunction would weigh against ABC.